THIRD DIVISION
June 29, 2007

No. 1-06-2155

| | | |
|---|---|---|
| *In re* REINY S., a Minor, | ) | Appeal from the |
| | ) | Circuit Court |
| Appellant, | ) | of Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 97 JA 22 |
| | ) | |
| v. | ) | |
| | ) | |
| Tonya W. and Arnold S., | ) | Honorable |
| | ) | Maureen Feerick, |
| Respondents-Appellees.) | ) | Judge Presiding. |

UPON DENIAL OF REHEARING

PRESIDING JUSTICE THEIS delivered the opinion of the court:

Following an unfitness hearing, the circuit court denied the State's petition to terminate the parental rights of the minor child Reiny's mother, respondent Tonya W., and father, respondent Arnold S. Specifically, the court found that the State had failed to establish that mother's repeated incarceration prohibited her from discharging her parental responsibilities or that mother failed to make reasonable progress toward reunification with Reiny. Regarding father, the court found that the State failed to prove that he failed to make reasonable progress toward reunification with Reiny.

On interlocutory appeal from the circuit court's order pursuant to Supreme Court Rule

306(a)(5) (210 Ill. 2d R. 306(a)(5)), Reiny's guardian *ad litem* (the GAL) contends that the circuit court's order denying the State's petition to terminate mother's and father's parental rights was against the manifest weight of the evidence because: (1) mother's repeated incarceration has prevented her from discharging her parental duties; (2) mother has failed to make reasonable progress toward Reiny's return to her care; and (3) father has failed to make reasonable progress toward Reiny's return to his care.[1]  For the following reasons, we reverse the circuit court's order regarding mother and remand her cause for a best interest hearing, but affirm the order regarding father.

The record discloses the following facts relevant to our determination of the issues on appeal.  Reiny was born on June 18, 1995.  On December 25, 1996, mother left Reiny home alone for at least three hours.  The landlord and the janitor in mother's building reported this incident to the Department of Children and Family Services (DCFS), indicating that mother had left Reiny home alone on several other occasions.  On January 3, 1997, the State filed a petition for adjudication of wardship.  On the same day, Reiny was taken into temporary DCFS custody, and the circuit court appointed the Office of the Cook County Public Guardian as Reiny's attorney and GAL.

On April 23, 1997, the court adjudicated Reiny a ward of the court, finding that she had been abused and neglected.  Service plans generated in February 1997 and September 1997 indicated that Reiny's permanency goal was reunification with her natural parents.  However,

---

[1]The State chose not to file a brief in this appeal.  However, we ordered the State to respond to a petition for rehearing filed by mother subsequent to the initial filing of our decision in this matter.

following a permanency hearing on March 3, 1998, Reiny's goal was changed to substitute care pending a court determination on termination of parental rights. The court found that mother and father had not made reasonable progress toward correcting the conditions that led to the removal of Reiny from their care.

On August 15, 2001, the State filed a petition to terminate mother's and father's parental rights. Therein, the State alleged that both parents were unfit because they: (1) failed to maintain a reasonable degree of interest in, concern for, or responsibility for Reiny's welfare, in violation of section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2000)); (2) deserted Reiny for more than three months next preceding the commencement of these proceedings in violation of section 1(D)(c) of the Adoption Act (750 ILCS 50/1(D)(c) (West 2000)); and failed to make reasonable efforts to correct the conditions which were the basis for the removal of Reiny from their care and/or failed to make reasonable progress toward the return of Reiny to them within nine months after the adjudication of neglect, or within any nine-month period thereafter, in violation of section 1(D)(m) of the Adoption Act (750 ILCS 50/1(D)(m) (West 2000)). With regard to mother only, the State also alleged that she was a habitual drunkard and/or addicted to drugs, other than those prescribed by a physician, for at least one year immediately prior to the commencement of the unfitness proceeding in violation of section 1(D)(k) of the Adoption Act (750 ILCS 50/1(D)(k) (West 2000)). The petition also noted that Reiny had been living in a foster home since August 22, 1997, and that her foster parents would like to adopt her. The GAL alleged that this would be in Reiny's best interest. Both parents filed answers to the petition.

The termination petition was subsequently amended multiple times. In addition to

correcting errors, the State added a claim that mother's rights should be terminated because of her repeated incarceration as a result of a criminal conviction, which has prevented her from discharging her parental duties, in violation of section 1(D)(s) of the Adoption Act (750 ILCS 50/1(D)(s) (West 2000)). The State also withdrew the allegations under sections 1(D)(c) and (k) of the Adoption Act. In addition, the State withdrew the petition in early 2005, but was granted leave to reinstate it several days later.

The court conducted the unfitness hearing on January 24, 2006. At the commencement of the hearing, the State indicated that the nine-month time periods relevant to its allegations pursuant to section 1(D)(m) of the Adoption Act were November 1, 1999 through August 1, 2000 for mother, May 1, 2000 through February 1, 2001 for father, and April 23, 1997 through January 23, 1998 and April 1, 2005 through January 1, 2006 for both parents.

Thereafter, Latasha Bonds, the family's caseworker from May 1997 to July 2000, testified. She explained that Reiny came "into the system" after mother left her home alone on several occasions. Bonds' responsibilities included monitoring Reiny and providing social services for the family. Bonds prepared service plans, progress reports, and notes pursuant to her duties.

When Bonds was assigned to the case, the goal was for Reiny to return home to her natural parents. In furtherance of that goal, Bonds assessed mother for services and determined that she was in need of drug treatment, random drug screening, individual counseling, and an alcohol assessment. Bonds referred mother to the relevant services. However, mother did not successfully complete them. Mother also missed appointments and failed to comply with the

visitation plan. However, in Janurary 1998, mother filed a motion for a finding of "no reasonable efforts," contending that Bonds and Bonds' agency were not, in essence, performing their duties. The record discloses that the circuit court never ruled on this motion.

Bonds testified that in February 1998, the goal was changed to substitute care pending a court determination on termination of parental rights. Among other things, this meant that visits between the parents and Reiny would be monthly instead of weekly. Nevertheless, mother's visits with Reiny continued to be sporadic. Mother did not attend the required service programs and was unsuccessfully discharged from her individual therapy in April 1998.

In August 1999, mother sent Bonds a letter indicating that she was a "changed woman" and expressed a desire to raise her own children. However, mother did not request any additional services to help her reunify with Reiny thereafter. In addition, mother's visits with Reiny continued to be sporadic and she failed to perform the required tasks in her service plan.

The service plan from February 2000, which was prepared by Bonds and admitted into evidence, reflected that mother was required to attend parenting classes, therapy, and scheduled visits with Reiny. Mother was also required to submit to random drug screening. The report indicated that mother complied only with drug screening and rated her overall progress as "unsatisfactory."

Around this time, Bonds lost contact with mother. In March 2000, police contacted Bonds and informed her that mother had been incarcerated. Mother was subsequently convicted of aggravated battery of a fireman and remained incarcerated until September 2002. Bonds was transferred from the case in July 2000.

Regarding father, Bonds testified that she first met him in April 1997. Bonds informed him that he needed to enroll in parenting classes. Father indicated that he had recently been released from prison and that he had completed a parenting class there. Bonds asked father to submit verification of the completion of the class, but he never did. However, Bonds did not attempt to verify his completion. In addition, Bonds did not refer father to any services during this time, and the service plan from September 1997 indicated that father "will be" offered services.

In December 1997, Bonds referred father for a psychological exam, which he completed in January 1998. The evaluation characterized father as an "enabler," and indicated that he should receive individual therapy. However, father never attended the therapy, claiming that it interfered with his work schedule. Father also visited with Reiny only sporadically during this time. However, on cross-examination, Bonds admitted that father and mother were actually living with Reiny at the home of Reiny's paternal grandmother, where Reiny had been temporarily placed.

At one point in 1998, father did request assistance from Bonds, and she referred him to parenting classes. However, father never participated in those classes. He also never requested assistance from Bonds again. In the first part of 1999, Bonds asked father why he failed to attend the parenting classes. He explained that the classes conflicted with his work schedule. Bonds referred him to another class that met at a different time, but he still failed to attend.

After Bonds left the case in July 2000, Larry McKay was assigned to the case from September 2000 through February 2001. Regarding mother, McKay sent her a letter shortly after he had been assigned to the case. She responded that she was incarcerated at the Lincoln

Correctional Facility. McKay arranged a visit with all three of mother's children at the correctional facility in December 2000. Mother remained incarcerated the entire time McKay was assigned to the case.

McKay first spoke with father in October 2000 when he telephoned the agency to discuss visitation. McKay explained that father could visit with Reiny once a month for an hour at either the agency or McDonald's. McKay also explained the procedure for scheduling visits. Because father did not have a residential telephone, McKay explained that he would contact father's pager when it was time to schedule the visit. Father would then have to call the agency. McKay also attempted to be flexible with the timing of visits by offering to schedule visits during evenings or weekends. However, father never returned McKay's pages. When father did speak with McKay, father complained that when he would call the agency, no one would answer and no one would return his messages. On cross-examination, father's attorney confronted McKay with a letter from McKay to father's attorney which provided a different arrangement for scheduling visits than the one to which McKay testified. McKay also admitted that father had left him at least one voicemail message at the agency and that father had written letters to the agency in attempt to reach him.

A visit was scheduled for November or December 2000. At that time, McKay explained to father the importance of him attending visits. Father once again indicated that the visitation schedule interfered with his work schedule. Father worked for the United States Postal Service and his schedule would vary. McKay offered to make alternative arrangements to accommodate father's schedule, but father never followed up to make the alternative arrangements. McKay's

case notes indicate that father called him regarding visitation on September 21, 2000, October 2, 2000, October 20, 2000, October 26, 2000, and November 3, 2000, before the visit finally took place.

During the late 2000 visit, McKay observed limited interaction between father and Reiny. He also observed no bond between them. It appeared that Reiny did not want to be at the visit and that she was ready to go immediately.

Regarding parenting classes, father told McKay that he had completed the classes while he was incarcerated several years earlier. McKay telephoned the correctional facility and was unable to obtain verification. However, McKay admitted on cross-examination that he had not requested father's Illinois Department of Corrections file.

The record also contains several letters from McKay to father from this time period. These letters indicate that visits were scheduled and rescheduled several times due to various factors, including the inability of Reiny's caregiver to make Reiny available for a scheduled visit and father's inability to be given time off from work to attend visits. The service plan from January 2001 discloses that father was "not in services" and "needed to attend" visits. McKay's notes also indicate that father was present at a permanency hearing on January 17, 2001.

After McKay, the State presented the testimony of caseworker Rochelle Hulett, who was assigned to the case from May 2005 through the time of trial. Hulett first met mother just prior to her assignment to the case at a scheduled visit between mother and Reiny. However, the visit did not actually occur because Reiny refused to attend. Hulett explained this situation to mother and informed her that she would talk to Reiny and encourage her to attend visits.

At that time, mother also told Hulett that she was living at a recovery home called Sanctuary Place. Hulett advised her to give her documentation of the services she was receiving at Sanctuary Place.

Roughly a month later, mother began requesting visits with Reiny. However, Reiny did not wish to visit mother. Mother next requested a Christmas visit with Reiny, but Reiny once again refused to see her. Reiny later told Hulett that she did not wish to visit her mother because she felt "let down a lot" by her mother, indicating that mother would promise her things, including gifts and money, that she would never provide. During the time that Hulett was assigned to the case, mother did not ask how Reiny was doing or send Reiny any cards or gifts. Mother did not ask for assistance with services, either.

Hulett met father for the first time outside of the courtroom prior to the May 2005 court date. At that time, Hulett informed father that he could contact her to schedule visits and services, and they exchanged contact information. However, father never contacted Hulett. Hulett was also unable to contact father at the address he provided. The telephone number father provided to Hulett had been disconnected. On cross-examination, Hulett admitted that father had been telephoning Reiny at the foster parent's home.

Prior to the close of its case-in-chief, the State admitted certified statements of mother's two criminal convictions. The first established that mother was found guilty of aggravated battery of a fireman on June 28, 2000, and sentenced to six years' imprisonment on July 21, 2000. Mother was given credit for 151 days served, which means that she was taken into custody on January 19, 2000. The second established that mother was found guilty of residential burglary

and sentenced to four years' imprisonment on July 12, 1993.

After the State rested, father admitted into evidence a certificate indicating that he had completed a parenting class in May 2002. Father presented no other evidence.

Mother then testified on her own behalf. When she left Reiny home alone, father was incarcerated, and she was living alone. Both of mother's parents were deceased, and she had no family or support network to which she could turn for help raising Reiny.

After Reiny was adjudicated neglected, she would visit Reiny weekly. Mother described her relationship with Bonds as "okay in the beginning." However, shortly thereafter, their relationship "went downhill." Bonds called mother a "poor excuse for a mother," and "trifling." Bonds also told mother that if she had anything to do with it, mother would never see Reiny again.

When visits became monthly, mother stated that she would attend unless she or Bonds had a prior appointment, in which case they would reschedule. Father would also attend the visits "the vast majority of the time," which would enable the parents to have two visits a month with Reiny instead of one. Mother claimed these visits continued until she was incarcerated in January 2000 for aggravated battery to a fireman. Mother admitted that she was convicted of that offense in June 2000. She then had no visits or contact with the agency until after she was sentenced and sent to the Illinois Department of Corrections in July 2000, at which point she wrote a letter to Bonds.

On cross-examination, mother admitted that the visits actually stopped in 1999 due to her becoming homeless. Mother also admitted that she "relapsed" in her heroin addiction sometime in

the late 1990's and did not successfully complete the drug treatment programs to which she had been referred for services, but she could recall specifically when. However, she did recall using heroin in November 1999, which she claimed was the last time she used it prior to becoming incarcerated.

After mother was sent to the Department of Corrections, she learned that she had been assigned a new caseworker, Larry McKay. In September 2000, McKay organized a visit with her three children at the correctional facility. Mother stated that these visits continued every month while she was incarcerated. In addition to the visits, mother would write letters to her sons. She did not write to Reiny because she did not have her address. Mother sent books to all of her children, sending them to Reiny through her caseworker.

When mother was released from prison in September 2002, she scheduled visits through Nashun Avery, a supervisor at the Beatrice Caffrey Youth Services agency. The visits continued through Christmas 2004, but then stopped. Mother did not know why they stopped, and would contact Avery and the agency, and even visit the agency, but had no success in scheduling a visit. In April 2005, when Hulett was assigned to the case, mother was scheduled to visit Reiny. However, the visit did not take place because Reiny did not want to visit her. Hulett suggested mother-daughter therapy to address Reiny's behavior. In the summer of 2005, mother and Reiny had a visit at the office of Reiny's therapist. No visits occurred after this until one week prior to the unfitness hearing in January 2006.

Mother explained that in the three years since her incarceration, she has been residing in Sanctuary Place, a subsidized, therapeutic home for individuals who are either homeless, HIV

positive, or chronic substance abusers. Mother stated that she qualified for the residence because she was homeless. Mother attended Alcoholics Anonymous meetings at the facility. She was also employed part-time as a cosmetologist at a funeral home and full-time with Cook County.

Prior to the close of evidence, the court took judicial notice of the fact that the court had granted a motion by the GAL for a finding of "no reasonable efforts" against the agency on June 7, 2001. In the motion, the GAL had contended this behavior constituted a lack of reasonable efforts to pursue the goal of terminating mother's and father's parental rights so that Reiny could be adopted. The court based its finding of "no reasonable efforts" on the fact that caseworkers failed to prepare service plans prior to three scheduled court dates in 1999 and that caseworkers failed to appear to testify prior to three scheduled court dates in 1998 and 1999. The court also specifically stated that in so finding, it was not addressing "in any way whether services were provided to the biological parents from May 5, 1998 through December 14, 2000."

The court ultimately denied the State's termination petition as to both mother and father, finding that the State had failed to prove either of them unfit. The court made oral findings of fact spanning roughly 50 pages of the record. Most significantly, the court found the caseworkers, particularly Bonds, to be incredible. It also found the State's witnesses to be ill-prepared to testify and their testimony to be contradicted by documentary evidence in the record. Regarding mother, she characterized her as someone who struggled with an addiction, but eventually overcame it. The court also characterized mother's conviction as distinct from the type of conviction that evidences a "commitment to a life of crime," such as a robbery, but rather, speculated that it could have been the result of a mere "emotional encounter with a fireman."

Further, the court found that it was mother's 2 ½ year incarceration that helped her to become a better parent by finally overcoming her addiction and added that a criminal conviction is not *per se* evidence of a lack of reasonable progress. The court found mother's testimony credible and believed that problems with the services did not begin until mother began complaining about the agency. The court thus concluded that the agency had a "motive for bias" against mother. Regarding father, the court made relatively few findings, simply noting that there was "a lack of information." Nevertheless, the court found that the evidence that was presented regarding father did not show a lack of reasonable progress.

The GAL subsequently petitioned this court for leave to appeal from the circuit court's order denying the State's termination petition under Supreme Court Rule 306(a)(5) (210 Ill. 2d R. 306(a)(5)). However, the GAL failed to provide a complete transcript of the adjudicatory hearing with its petition. Therefore, we denied its petition for leave to appeal.

The GAL then filed a motion in the supreme court for a supervisory order to direct this court to entertain its appeal. The supreme court granted the motion (In re Reiny S., No. 103423 (October 17, 2006)), and this court vacated our prior denial of the GAL's petition and granted it leave to appeal.

The GAL now contends, *inter alia*, that the circuit court's order denying the State's termination petition as to both parents was against the manifest weight of the evidence. We will first address its allegations regarding both parents under section 1(D)(m) of the Adoption Act. 750 ILCS 50/1(D)(m) (West 2004).

Under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2004)), the

involuntary termination of parental rights is a two-step process. In re C.W., 199 Ill. 2d 198, 210, 766 N.E.2d 1105, 1112 (2002). First, the State must prove that the parent is unfit as defined in section 1(D) of the Adoption Act. 750 ILCS 50/1(D) (West 2004); C.W., 199 Ill. 2d at 210, 766 N.E.2d at 1112-13. Because the termination of parental rights constitutes a complete severance of the parent-child relationship, proof of parental unfitness must be clear and convincing. In re C.N., 196 Ill. 2d 181, 208, 752 N.E.2d 1030, 1045 (2001). Only if the court makes a finding of unfitness will the court go on to consider whether it is in the best interest of the child to terminate parental rights. 705 ILCS 405/2-29(2) (West 2004); C.W., 199 Ill. 2d at 210, 766 N.E.2d at 1113.

Because the circuit court is in the best position to assess the credibility of witnesses, a reviewing court may reverse a circuit court's finding of unfitness only where it is against the manifest weight of the evidence. C.N., 196 Ill. 2d at 208, 752 N.E.2d at 1045; In re M.J., 314 Ill. App. 3d 649, 655, 732 N.E.2d 790, 795 (2000). A finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident. C.N., 196 Ill. 2d at 208, 752 N.E.2d at 1045.

Section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2004)) provides that a parent may be declared unfit if she fails "to make reasonable progress toward the return of the child to the parent within 9 months after an adjudication of neglected or abused minor." Section 1(D)(m)(iii) of the Adoption Act (750 ILCS 50/1(D)(m)(iii) (West 2004)) provides that a parent may be declared unfit if she fails "to make reasonable progress toward the return of the child to the parent during any 9-month period after the end of the initial 9-month period following

the adjudication of neglected or abused minor."

Reasonable progress has been defined as " 'demonstrable movement toward the goal of reunification.' " C.N., 196 Ill. 2d at 211, 752 N.E.2d at 1047, quoting In re J.A., 316 Ill. App. 3d 553, 565, 736 N.E.2d 678, 688 (2000). "[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later became known and which would prevent the court from returning custody of the child to the parent." C.N., 196 Ill. 2d 216-17, 752 N.E.2d at 1050. Continued use of illegal drugs and repeated illegal activity evidence "the opposite of reasonable progress" and constitute conditions which would prevent the court from returning custody of the child to the parent. In re S.E., 296 Ill. App. 3d 412, 415, 695 N.E.2d 1367, 1369 (1998) (reversing trial court and finding unfitness where father continued to use illegal drugs, participated in gang activities, and engaged in criminal activity, rather than undergoing psychological evaluation and seeking treatment).

In making this determination, only evidence from the relevant time period may be considered in determining whether a parent is unfit. In re D.F., 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003). This is because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial. D.F., 208 Ill. 2d at 235-36, 802 N.E.2d at 808.

Here, we will first address the nine-month time period pertaining to mother from November 1, 1999 to August 1, 2000. This time period would fall under subsection (m)(iii). 750

ILCS 50/1(D)(m)(iii) (West 2004).

Relevant to this time period, the State presented the testimony of Bonds, which established that mother's visits with Reiny were sporadic and that mother was not compliant with the requirements of the relevant service plans from that time period. Specifically, the service plan from February 2000 indicated that mother was required to attend parenting classes, therapy, and scheduled visits with Reiny. She was also required to submit to random drug screening. The report indicated that mother complied with only one of these items and rated her overall progress as "unsatisfactory." Bonds also testified that mother did not seek assistance from her to participate in services to help her reunify with Reiny in either 1999 or 2000. In fact, during the first few months of this time period, Bonds was unable to contact mother. Around March 2000, police contacted Bonds and informed her that mother had been incarcerated.

The State also submitted certified statements of mother's criminal convictions. Significantly, mother was found guilty of aggravated battery of a fireman on June 28, 2000, and sentenced to six years' imprisonment on July 21, 2000. She was given credit for 151 days served, which establishes that she was taken into custody on January 19, 2000. Thus, she spent more than six months of the nine-month period in prison. In summary, the State's evidence established that mother was noncompliant with her service plan and unable to be located during the first 2 ½ months of the time period and that she was incarcerated for aggravated battery for the remainder.

In her case-in-chief, mother presented no evidence to rebut the State's evidence but, rather, made admissions that further supported the State's case. Significantly, mother admitted that she used heroin on November 17, 1999. She also admitted that she became homeless in the

latter part of 1999 and ceased visiting Reiny. In addition, mother admitted that she committed a criminal act, aggravated battery of a fireman, for which she was incarcerated from January 19, 2000 to September of 2002.

Thus, the only evidence contained in the record from the relevant time period showed that mother did not make reasonable progress toward reunification with Reiny. Although the circuit court discounted the credibility of Bonds' testimony, even without her testimony, the record contains clear and convincing evidence of mother's criminal convictions, drug use, and lack of progress toward reunification with Reiny. However, instead of relying upon this evidence, the circuit court relied upon evidence from outside of the nine-month time period, namely, how mother began to live her life after she was released from prison in September 2002. As we explained above, such evidence may not be considered. D.F., 208 Ill. 2d at 237-38, 802 N.E.2d at 809. The circuit court also relied on conjecture, rather than evidence, to diminish the fact that mother committed a felony criminal offense for which she was sentenced to six years' imprisonment in the early part of the nine-month time period. Specifically, the circuit court speculated that mother's aggravated battery conviction might have been a mere "emotional encounter with a fireman," rather than a conscious choice to live a life of crime. Such speculation is unsupported by the record. It is equally likely that mother made a calculated effort to inflict a beating upon an individual who happened to be a fireman; however, we will not make such speculations.

The evidence adduced at the adjudicatory hearing establishes that during the nine-month period in question, mother took illegal drugs, committed a felony for which she was incarcerated

for the majority of the nine-month period, lost contact with the agency, failed to attend visits, and failed to comply with her service plan. Such evidence does not establish " 'demonstrable movement toward the goal of reunification,' " but rather, constitutes "the opposite of reasonable progress." C.N., 196 Ill. 2d at 211, 752 N.E.2d at 1050, quoting J.A., 316 Ill. App. 3d at 565, 736 N.E.2d at 688; S.E., 296 Ill. App. 3d at 415-16, 695 N.E.2d at 1369-70; see also In re D.D., 309 Ill. App. 3d 581, 589, 723 N.E.2d 397, 404-05 (2000). We therefore find the circuit court's finding that mother was not unfit based on a failure to make reasonable progress during that time period to be against the manifest weight of the evidence, and reverse its denial of the State's termination petition with respect to mother. Because parental rights may be terminated based upon a finding of unfitness on any single ground set forth in section 1(D) of the Adoption Act, and we have found mother unfit under subsection (m)(iii), we need not address the GAL's remaining contentions with regard to mother. In re D.D., 196 Ill. 2d 405, 422, 752 N.E.2d 1112, 1122 (2001). We accordingly remand mother's cause to the circuit court for a best interest hearing.

Turning to father, we must initially observe that the GAL devotes only one short paragraph of its 47-page brief to legal analysis of the three nine-month time periods relevant to the father. In that paragraph, the GAL cites no legal authority in support of its argument. In fact, the GAL does not even reference which nine-month period it discusses, but rather, makes broad generalizations about father's conduct. We accordingly find the GAL's arguments regarding father to be waived. 210 Ill. 2d R. 341(h)(7); Novakovic v. Samutin, 354 Ill. App. 3d 660, 667, 820 N.E.2d 967, 972 (2004).

We will nevertheless conduct a brief review of the sufficiency of the evidence regarding the three time periods relevant to father. The first time period was April 23, 1997 through January 23, 1998. This time period is covered by section (m)(ii). 750 ILCS 50/1(D)(m)(ii) (West 2004). Relevant to this time period, the State presented the testimony of Bonds. In April 1997, Bonds informed father that he needed parenting classes. Father indicated that he had recently been released from prison and that he had completed a class while he was incarcerated. Father never provided verification of the completion of this class, but Bonds never attempted to verify it, either. In December 1997, Bonds referred father for a psychological exam, which he completed in January 1998. The examination determined that father should receive individual counseling. However, although it was determined that father needed both parenting classes and counseling, Bonds made no referrals for services for father. The relevant service plan from September 1997 confirms this, indicating that father "will be" offered services and visitation in the future. Regarding visitation, Bonds noted that father's visits were sporadic. However, Bonds admitted, and the service plan confirmed, that father and mother were living with Reiny at the home of Reiny's paternal grandmother, where Reiny had been temporarily placed, during this time.

In these circumstances, particularly because father had never been referred for any services and because the circuit court found Bonds's testimony incredible, we cannot say that the a finding of unfitness was "clearly evident." C.N., 196 Ill. 2d at 208, 752 N.E.2d at 1045. As noted, one aspect of the "benchmark" for progress are the requirements of the services plans. C.N., 196 Ill. 2d 216-17, 752 N.E.2d at 1050. Where there is no benchmark, we cannot determine whether there has been any progress. See, e.g., In re R.B., 297 Ill. App. 3d 97, 101, 696 N.E.2d 1259,

1262 (1998) (refusing to find parent unfit where she had failed to perform acts which she was never told she was required to do). Therefore, the circuit court's finding regarding this time period was not against the manifest weight of the evidence.

The second time period relevant to father is May 1, 2000 through February 1, 2001, which would fall under subsection (m)(iii). 750 ILCS 50/1(D)(m)(iii) (West 2004). Relevant to that time period, the State presented the testimony of McKay, who testified that he was not assigned to the case until September 2000. Notably, Bonds, who was transferred from the case in July 2000, did not mention anything regarding father's progress specifically in 2000. Accordingly, the State presented evidence for only five of the nine months in this time period.

McKay indicated that he met father when father contacted the agency in October 2000 to schedule a visit with Reiny. McKay indicated that he had a difficult time contacting father to schedule visits, but also admitted that father had left him at least one voicemail message and had written letters to the agency in attempt to reach him. McKay had difficulty scheduling visits with father because of father's work schedule. Father worked for the United States Postal Service at the time, and his schedule would vary. A visit was scheduled in November or December, during which time McKay observed limited interaction between father and Reiny. McKay testified to a procedure for scheduling visits, but on cross-examination, was confronted with a letter he wrote to father's attorney, which discussed a different arrangement for doing so.

The service plan from January 2001 indicated that father was not in services and that he needed to attend visits. McKay attempted to verify that father had completed the parenting class, but admitted that he did not request father's file from the Department of Corrections. McKay's

1-06-2155

case notes reflect that father contacted him several times to schedule visits; however, his varying work schedule was an obstacle on several occasions. A letter in the record also indicates that Reiny's foster parent was unable to make her available for a visit on at least one occasion. McKay's case notes also indicate that father was present for a permanency hearing in January 2001.

The circuit court found McKay's testimony incredible and refused to find father unfit based on this paucity of other evidence from this nine-month time period. McKay's testimony aside, the service plans, caseworker notes, and letters demonstrate that father was making efforts to contact the agency to schedule visits around his work schedule. At least one visit was rescheduled due to a scheduling conflict with Reiny's caregiver and not father. Father was concerned enough about the failure of communication in scheduling visits to involve his attorney, to whom McKay responded via a letter contained in the record, which outlined the procedure for visitation. Father also attended court dates. This evidence does not clearly and convincingly show that father failed to make reasonable progress during this nine-month time period. We thus cannot say that an opposite conclusion from the circuit court's is "clearly evident." C.N., 196 Ill. 2d at 208, 752 N.E.2d at 1045.

The third and final nine-month time period specified for father was April 1, 2005 through January 1, 2006. This time period would also be covered by subsection (m)(iii). 750 ILCS 50/1(D)(m)(iii) (West 2004). There was no caseworker testimony regarding the first month of the period. The record does not indicate who the caseworker was following McKay, whose assignment ended in February 2001, and Hulett, whose assignment began in May 2005.

21

Hulett testified that she first met father outside of the courtroom prior to a May 5, 2005 court date. Father's presence at the court date demonstrates that he was concerned about the situation with his daughter and that he was interested in the outcome of the proceeding. At that time, they exchanged contact information, and she advised him to call her to schedule visits and services. He never contacted her. When Hulett tried to contact him, the number he had given her indicated that it had been disconnected. However, the circuit court found Hulett's testimony incredible, and there is no other evidence from this time period in the record, such as service plans or caseworker notes. The circuit court determined that this evidence was insufficient to clearly and convincingly prove that father was unfit under section 1(D)(m)(iii) of the Adoption Act, and we cannot say that an opposite conclusion is "clearly evident." C.N., 196 Ill. 2d at 208, 752 N.E.2d at 1045.

We therefore affirm the circuit court's order denying the State's termination petition with respect to father. As noted above, with respect to mother, we reverse the circuit court's order denying the termination petition and remand the cause for a best interest hearing.

Since we initially issued our decision in this matter on March 30, 2007, mother filed a petition for rehearing. Therein, she relies on the supreme court's decision in In re Tekela, 202 Ill. 2d 282, 780 N.E.2d 304 (2002), and claims that our decision in this appeal was rendered moot because the circuit court issued a new permanency order in this matter on January 25, 2007, which changed Reiny's permanency goal from termination of parental rights to private guardianship. We ordered the GAL and the State to respond to mother's petition. For the reasons that follow, we find that the situation presented in this case is unlike that in Tekela and

22

that Reiny's appeal from the circuit court's July 26, 2006 order denying the State's petition to terminate mother's and father's parental rights was not rendered moot by the circuit court's January 25, 2007 order changing Reiny's permanency goal from termination to private guardianship.

However, we must initially note that the failure of the parties to notify this court of the new permanency order entered on January 25, 2007 until mother's petition for rehearing has delayed the conclusion of this appeal for nearly three months. As the supreme court has recognized, child custody proceedings are extremely time-sensitive. In re D.T., 212 Ill. 2d 347, 367, 818 N.E.2d 1214, 1229 (2004). In addition, the uncertainty created by protracted appeals in child custody cases aggravates the emotional problems that a child may experience because of a lack of permanency. Tekela, 202 Ill. 2d at 296, 780 N.E.2d at 312. Thus, the parties' failure to notify the court of the new permanency order in this case has only served to create further problems for Reiny.

"An appeal is considered moot where it presents no actual controversy or where the issues involved in the trial court no longer exist because intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." In re J.T., 221 Ill. 338, 349-50, 851 N.E.2d 1, 7-8 (2006). For instance, in Tekela, the supreme court found that a mother's appeal from a circuit court order terminating her parental rights was moot where she failed to request a stay of the order pending her appeal and the children's subsequent adoption was finalized during the pendency of the appeal. Tekela, 202 Ill. 2d at 293, 780 N.E.2d at 310-11.

23

Since <u>Tekela</u>, the supreme court amended Supreme Court Rule 305 to automatically stay an order terminating parental rights if a notice of appeal is timely filed. 210 Ill. 2d R. 305. However, as mother correctly notes, the automatic stay provision of Rule 305 applies only to orders terminating parental rights; it does not apply to orders denying petitions to terminate parental rights. 210 Ill. 2d R. 305. As mother also correctly notes, neither the State nor the GAL requested a stay of the circuit court's July 26, 2006 order denying the petition. Thus, nothing prevented the circuit court from conducting a new permanency hearing in January and changing Reiny's permanency goal.

However, the supreme court has made clear that a permanency goal is not a final determination on the merits but, rather, is an intermediate procedural step taken for the protection and best interests of the child. <u>In re D.S.</u>, 198 Ill. 2d 309, 329, 763 N.E.2d 251, 262 (2001). Instead, the permanency goal looks to the future status of the child. 705 ILCS 405/2-28(3)(a) (West 2006). In fact, section 2-28(2) of the Act further provides that the permanency order *must* be reviewed and reevaluated at a minimum of every six months until the court determines that the goal has been achieved. 705 ILCS 405/2-28(2) (West 2006); <u>In re Curtis B.</u>, 203 Ill. 2d 53, 59, 784 N.E.2d 219, 223 (2002). Thus, all of the rights and obligations set forth in the permanency order remain open for reexamination and possible revision until the permanency goal is achieved. <u>Curtis B.</u>, 203 Ill. 2d at 60, 784 N.E.2d at 223; see also <u>In re Faith B.</u>, 216 Ill. 2d 1, 17, 832 N.E.2d 152, 161 (2005) (holding that the matter is not final until the permanency goal has been reached).

Here, the circuit court's January 25, 2007 order clearly indicates that the permanency goal

1-06-2155

of private guardianship has not been attained.[2]  Therefore, it is subject to change.  As a result, it is not impossible for this court to grant the GAL the relief it seeks and the appeal is not moot.

In this regard, we find the situation presented in Tekela distinguishable.  In Tekela, the children's permanency goal of termination was attained and the children were put up for adoption.  Tekela, 202 Ill. 2d at 285, 780 N.E.2d at 306.  The mother appealed the circuit court's order terminating her parental rights, but did not request a stay and, as we discussed earlier, no automatic stay provision existed at that time.  Tekela, 202 Ill. 2d at 285, 780 N.E.2d at 306.  However, during the pendency of the appeal, which took over three years, the children were adopted and the one-year statutory time limit in which to challenge the adoption elapsed.  Tekela, 202 Ill. 2d at 286, 780 N.E.2d at 306.  Therefore, the adoption was final and unchangeable, and the supreme court accordingly found the mother's appeal moot.  Tekela, 202 Ill. 2d at 293, 780 N.E.2d at 310-11.

Here, unlike Tekela, the permanency goal has not been attained and is therefore still subject to change.  Moreover, the situation of an adoption becoming final is not present.  Thus, we find that this appeal has not been rendered moot by the circuit court's January 25, 2007 order.

Reversed and remanded in part; affirmed in part.

GREIMAN and KARNEZIS, JJ., concur.

---

[2]The circuit court's order also indicates that the reason for selecting the goal of private guardianship is to provide permanency because Reiny has been in the same foster home for nine years, has bonded with her foster mother, and wishes to remain there.

25

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT
_____

*In re* **REINY S., a Minor,**

    **Appellant,**

**(The People of the State of Illinois,**

    **Petitioner-Appellee,**

    **v.**

**Tonya W. and Arnold S.,**

    **Respondents-Appellees).**

_____

**No. 1-06-2155**

**Appellate Court of Illinois**
**First District, Third Division**

**Filed: June 29, 2007**

_____

**PRESIDING JUSTICE THEIS delivered the opinion of the court.**

**Greiman and Karnezis, JJ., concur.**

_____

**Appeal from the Circuit Court of Cook County**
**Honorable Maureen Feerick, Judge Presiding**

_____

| | | | |
|---|---|---|---|
| **For APPELLANT, the Minor,** | **Office of the Public Guardian of Cook County**<br>**Robert F. Harris**<br>**Kass A. Plain**<br>**Janet L. Barnes**<br>**2245 W. Ogden Ave., 4th Floor**<br>**Chicago, IL 60612** | | |
| **For APPELLEE, the People,** | **Richard A. Devine, State's Attorney**<br>**James E. Fitzgerald, Assistant State's Attorney**<br>**Nancy Kisicki, Assistant State's Attorney**<br>**Nancy Faulls, Assistant State's Attorney**<br>**300 Richard J. Daley Center**<br>**Chicago, IL 60602** | | |
| **For APPELLEE, the Mother,** | **Marv Raidbard**<br>**53 W. Jackson, #664**<br>**Chicago, IL 60604** | **For APPELLEE, the Father,** | **Thomas M. O'Connell**<br>**947 N. Plum Grove Rd.**<br>**Schaumburg, IL 60173** |