NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 200420-U

NO. 4-20-0420

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 15, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* K.H. and D.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 17JA28 |
| v. | ) | |
| Jaineka B., | ) | Honorable |
| Respondent-Appellant). | ) | John R. Kennedy, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court's findings respondent was unfit under section 1(D)(m)(ii) of
the Adoption Act and it was in the minor children's best interests to terminate
respondent's parental rights were not against the manifest weight of the evidence.

¶ 2    In February 2020, the State filed a motion for the termination of the parental

rights of respondent, Jaineka B., as to her minor children, K.H. (born in May 2014) and D.H.

(born in April 2017). After a two-day hearing, the Champaign County circuit court found

respondent unfit as alleged in the termination motion. At an August 2020 hearing, the court

found it was in the minor children's best interests to terminate respondent's parental rights.

¶ 3    Respondent appeals, asserting the circuit court erred by (1) finding her unfit and

(2) concluding it was in the minor children's best interests to terminate her parental rights. We

affirm.

¶ 4                                      I. BACKGROUND

¶ 5 The minor children's fathers are not parties to this appeal. In May 2017, the State filed a petition for the adjudication of wardship of the minor children. The first count of the petition alleged the minor children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2016)) because their environment was injurious to their welfare when they resided with respondent and/or D.H.'s father in that said environment exposed the minor children to domestic violence. The second count asserted D.H. was neglected pursuant to sections 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2016)) because his environment was injurious to his welfare when he resided with his father in that said environment exposed him to illegal substances. After an August 2017 hearing, the circuit court found the minor children neglected as alleged in the first count and dismissed the second count. At a September 2017 hearing, the court entered a dispositional order finding respondent was unfit and unable to care for, protect, train, or discipline the minor children. The order noted respondent had significant issues related to (1) domestic violence and her reaction to it for the safety of herself and her family, (2) substance abuse, and (3) mental health. The court noted respondent had not been able to address any of those issues honestly and effectively and could not provide a safe home for the minor children. The court made the minor children wards of the court and appointed the Department of Children and Family Services (DCFS) as the minor children's guardian and custodian.

¶ 6 In February 2019, the State filed a motion to terminate respondent's parental rights to her minor children. The motion asserted respondent was unfit because she failed to make reasonable progress toward the minor children's return during any nine-month period after the neglect adjudication, specifically May 25, 2018, to February 25, 2019. See 750 ILCS 50/1(D)(m)(ii) (West 2018). The motion also contended respondent was unfit for failing to

maintain a reasonable degree of interest, concern, or responsibility as to the minor children's welfare. See 750 ILCS 50/1(D)(b) (West 2018). In February 2020, the State filed an amended motion for termination of parental rights, asserting respondent was unfit because she failed to make (1) reasonable efforts to correct the conditions that were the basis for the minor children's removal from her during any nine-month period following the neglect adjudication (750 ILCS 50/1(D)(m)(i) (West 2018)) and (2) reasonable progress toward the minor children's return during any nine-month period after the neglect adjudication (750 ILCS 50/1(D)(m)(i) (West 2018)). Both counts alleged the relevant nine-month period was May 10, 2019, to February 10, 2020.

¶ 7        In June 2020, the circuit court commenced the fitness hearing. The State presented the testimony of (1) Sherri Cummins, case manager from March to August 2019; (2) Desiree Woodson, case manager since September 2019; (3) Sairah Jahangir, case supervisor since September 2019; (4) David Griffet, detective sergeant with the Champaign police; and (5) Patricia Ray, substance abuse and mental health counselor. The State also asked the court to take judicial notice of the following two criminal cases, involving Keontae C., the father of respondent's infant born in February 2020: (1) a July 2019 charge for possession with the intent to deliver a controlled substance (People v. Keontae C., No. 19-CF-1019 (Cir. Ct. Champaign County)) and (2) September 2019 charges for unlawful possession of a controlled substance and manufacturing or delivery of a controlled substance (People v. Keontae C., No. 19-CF-1344 (Cir. Ct. Champaign County)). The court also took judicial notice of all of the prior orders in this case. Respondent presented one exhibit, a July 11, 2020, certificate of completion signed by Ray. The certificate noted respondent began services on March 8, 2019, and respondent had completed the following: (1) 42 sessions of partner abuse intervention/relationship groups, (2) 8

sessions of parenting education, (3) 8 sessions of anger management/problem solving, (4) 4 sessions of relationship counseling, (5) 40 hours of homework and worksheet completion, (6) "multiple hours" of telephone discussions with her counselor, and (7) 21 hours of parenting and relationship videos with homework assignments. The certificate stated respondent completed all work assigned and all requirements of respondent's program. It further noted respondent's progress was good and her prognosis was good if she used the material provided.

¶ 8        Cummins testified she took over the case in March 2019, and at that time, respondent was participating in individual counseling, including some domestic violence counseling. To the best of Cummins's knowledge, respondent was still in counseling when Cummins left the case. While Cummins was the case manager, she did not refer respondent for any additional services. Moreover, Cummins testified she did not have any difficulty contacting respondent. As to visitation, Cummins testified respondent was just starting third-party supervised visits, and respondent would visit the minor children at their grandmother's home. Cummins observed respondent's May 19, 2019, visit with the minor children. According to Cummins, the minor children seemed to have a good time during the visit. Cummins discussed with respondent the possibility of changing to unsupervised visits, but visits were not changed because a new case manager was taking over the case. Cummins also testified respondent did find housing in July 2019, and the residence was located on Rodney Drive. Respondent reported she was living alone, although Cummins had heard respondent was in a relationship and was unsure if respondent was living with someone. Cummins did not have any concerns about respondent's housing.

¶ 9        Woodson testified she took over the case in September 2019 and met with respondent in the Champaign County jail. Respondent was serving a 30-day sentence and was

not engaged in services during that time. After her release to the end of December 2019, respondent regularly visited the minor children. Woodson observed one visit between respondent and the minor children at their grandmother's home, and the visit went well. Respondent was supposed to move to unsupervised visitation when Woodson took over the case, but respondent remained on third-party supervised visitation. Woodson explained respondent's visitation remained the same because respondent's paramour, Keontae, had been arrested at respondent's home with illegal substances on his person when respondent was in jail. When asked about her relationship with Keontae, respondent denied Keontae lived at respondent's home but never denied she was in a relationship with him. Respondent gave birth to Keontae's child on February 21, 2020. Woodson spoke with respondent and Keontae about the need for Keontae to be involved in this case if the goal was return home. Woodson was never able to refer Keontae for services because he did not sign any consents. Woodson further testified she never recommended unsupervised visitation because she was unsure if respondent was still in a relationship with Keontae. Woodson explained to respondent she was concerned about Keontae because he was a violent person and a drug dealer and a previous paramour of respondent had been killed in respondent's home. Woodson did not believe respondent "fully processed" being around Keontae was a safety concern for the minor children. Woodson wanted to ensure the safety of the minor children before respondent received unsupervised visits.

¶ 10 According to Woodson, respondent was attending individual counseling, domestic violence counseling, and a parenting class. However, respondent had not completed any services by February 10, 2020. Woodson testified respondent's counselor wanted to complete counseling in January 2020 but Woodson did not agree. Woodson explained respondent was in jail in September and October 2019 and respondent was not engaged in services in November 2019.

Woodson did not personally refer respondent to any other services from September 2019 to February 2020. However, Woodson believed her supervisor referred respondent to finish parenting classes and maybe another service. Additionally, Woodson testified she had a hard time getting in touch with respondent in January 2020. Woodson explained she had to meet with respondent once a month, and that month she needed to assess respondent's home because respondent had moved. Woodson described her contact with respondent as "phone tag." Woodson further testified her supervisor was able to assess respondent's home.

¶ 11 Jahangir testified she and Woodson had trouble contacting respondent after she was released from jail. Respondent did attend a meeting on November 21, 2019, during which they addressed the safety concerns related to respondent's relationship with Keontae since he was arrested in her home with 12 grams of cocaine. Jahangir noted respondent had lied to Cummins, Woodson, and Jahangir about being in a relationship with Keontae. Respondent admitted to being in a relationship with him but denied he lived with her. Jahangir and Woodson also expressed concern over respondent's lack of progress. Respondent was very upset Woodson had requested respondent's counseling be extended because respondent felt she was ready to complete counseling. Jahangir testified respondent was expected to reengage in counseling upon her release from jail but respondent had been inconsistent in her engagement in October 2019 and into November 2019. Additionally, Jahangir testified respondent "no-showed" the meeting in December 2019 and the residence assessment in January 2020. Jahangir was able to meet with respondent on February 17, 2020, at the minor children's grandmother's home.

¶ 12 Detective Sergeant Griffet testified he went to a home on Austin Drive in Urbana on July 8, 2019, to locate a Keith C. Keith C. was not present, but Keontae was outside the residence. The residence was Keontae's parent's home and was listed as Keontae's address for

parole purposes. The police obtained a search warrant for the Austin Drive residence and located 52 grams of cocaine and a loaded pistol. On September 16, 2019, Detective Sergeant Griffet conducted surveillance of 2202 Rodney Drive due to Keontae having an outstanding warrant for the July 2019 incident. He observed Keontae exit the residence with a female. The female got into a vehicle and left. Keontae then went back into the residence. With the assistance of other officers, Detective Sergeant Griffet knocked on the west side door of the residence. Keontae opened the door and then slammed it in Detective Sergeant Griffet's face. Another officer forced the door open, and they arrested Keontae inside the door at the kitchen. Keontae had two bags of suspected cocaine on his person, which ultimately weighed 12 grams. The officers also found a small digital scale on the kitchen counter.

¶ 13    Ray testified she was respondent's individual counselor. Ray noted respondent was also in a partner abuse intervention program and a parenting class, which began in March 2020. Respondent began counseling with Ray in March 2019 for substance abuse and partner abuse. Ray met with respondent once a week. From March until June 2019, respondent attended counseling consistently. Thereafter, respondent only came to one session in June, two sessions in July, one session in August, and none in September and October. Respondent did attend every session in November and a session the first week of December 2019. Respondent did not attend counseling again until February 26, 2020. When she resumed counseling in February 2020, respondent consistently attended every week. Respondent was "a very good participant."

¶ 14    When respondent resumed counseling in February 2020, Ray asked respondent about her previous inconsistent attendance. Respondent explained she was very discouraged when she learned her treatment needed to be extended. Ray told respondent she felt respondent needed additional services because respondent's residence was raided and thus was an unsafe

- 7 -

environment for the minor children. As to attendance, respondent also noted her incarceration and new baby.

¶ 15    At the conclusion of the hearing, the circuit court found respondent unfit on both grounds alleged in the termination motion.

¶ 16    On August 20, 2020, the circuit court held the best interests hearing. The State only presented the best interests report, and respondent testified on her own behalf. The best interests report stated K.H. was then six years old and had been in foster care since he was three. D.H. was three years old and had been in foster care since birth. While in foster care, K.H. and D.H. had resided in the same placement with their maternal grandmother, Mary B. Respondent's baby, born in February 2020, also lived in Mary's home. According to the report, K.H. and D.H. were thriving in their grandmother's care and were "very bonded" to her. Mary was "extremely committed to providing permanency via adoption" for both minor children. She was also "very willing and supportive of maintaining a bond" between the minor children and respondent as long as respondent was safe.

¶ 17    Moreover, the best interests report stated the minor children did have an apparent bond with respondent and visits went well. Respondent did a good job of engaging the minor children and focused on the minor children during visits. Respondent's visitation had remained on third-party supervised visitation since July 2019 because of concerns of respondent engaging in an unsafe relationship. Respondent had a three-bedroom apartment. She had also successfully completed substance abuse counseling. Respondent was still required to do random drug tests. Her drug tests had all been negative, but she had failed to appear for the tests five times from June 2020 to August 2020. Respondent was still engaged in individual counseling.

¶ 18    The report recommended respondent's parental rights be terminated. It noted

respondent "ha[d] shown great inconsistency and dangerous decision making in the almost three years her case ha[d] been open." While respondent had periods of engagement where she seemed motivated and ready to turn things around, she would then engage in unsafe situations and relationships and seek to hide information from her case manager. Specifically, respondent was not forthcoming with information "regarding the situation of her home, other people living in her home or frequenting her home, and the types of risks and situations her relationships would expose herself and her children too [*sic*]." Respondent clearly loved her children but had not demonstrated a consistent ability to avoid unsafe interactions, relationships, and situations.

¶ 19 Respondent testified she had a great relationship with the minor children. She had a two-bedroom home and had recently been allowed unsupervised visits with her infant. Respondent denied being in a current relationship with Keontae and described her past relationship with him as only a sexual one. She felt she had come a long way and learned a lot of parenting skills. Respondent had also learned to stay the course and not get discouraged and depressed.

¶ 20 At the conclusion of the evidence, the State argued respondent's parental rights should be terminated. The guardian *ad litem* agreed with the State's recommendation. Respondent's counsel argued against termination of parental rights, noting a substantial change in circumstances had occurred since the filing of the motion to terminate. Respondent had completed her services and learned from them. She had remained active in the minor children's lives and had good visits with them. Moreover, counsel argued respondent will likely retain parental rights to her baby, so it would not be in the minor children's best interests to be separated from the baby. After hearing the parties' arguments, the circuit court found the termination of respondent's parental rights was in the minor children's best interests.

Respondent asked to speak and the court allowed her to do so. She asked the court to give her six months to prove she could stay on the straight and narrow path. Respondent also emphasized a termination of parental rights would separate her children. After hearing respondent speak, the circuit court did not change its decision.

¶ 21 On August 28, 2020, respondent filed a notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases also govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of the appeal pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 22 II. ANALYSIS

¶ 23 Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2018)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor children's best interests that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004).

¶ 24 Since the circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427 (2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667, 756 N.E.2d at 427. Thus, a reviewing court will not

disturb a circuit court's unfitness finding and best-interests determination unless they are contrary to the manifest weight of the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005) (fitness finding); *In re J.L.*, 236 Ill. 2d 329, 344, 924 N.E.2d 961, 970 (2010) (best-interests determination). A circuit court's decision is against the manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354, 830 N.E.2d at 517.

¶ 25                          A. Respondent's Fitness

¶ 26          Respondent contends the circuit court erred by finding her unfit. In this case, the circuit court found respondent unfit on both grounds alleged in the petition. One basis for the circuit court's unfitness finding was section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)), which provides a parent may be declared unfit if he or she fails "to make reasonable progress toward the return of the child[ren] to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act." Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007) (quoting *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001)). Moreover, they have explained reasonable progress as follows:

          " '[T]he benchmark for measuring a parent's "progress toward the

          return of the child[ren]" under section 1(D)(m) of the Adoption

          Act encompasses the parent's compliance with the service plans

          and the court's directives, in light of the condition which gave rise

          to the removal of the child[ren], and in light of other conditions

          which later became known and which would prevent the court

- 11 -

from returning custody of the child[ren] to the parent.' " *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (quoting *C.N.*, 196 Ill. 2d at 216-17, 752 N.E.2d at 1050).

Additionally, this court has explained reasonable progress exists when a circuit court "can conclude that *** the court, in the *near future*, will be able to order the child[ren] returned to parental custody. The court will be able to order the child[ren] returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child[ren]." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991). We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461, 577 N.E.2d at 1387).

¶ 27　　　　In determining a parent's fitness based on reasonable progress, a court may only consider evidence from the relevant time period. *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003)). Courts are limited to that period "because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial." *Reiny S.*, 374 Ill. App. 3d at 1046, 871 N.E.2d at 844. In this case, the petition alleged the relevant nine-month period was May 10, 2019, to February 10, 2020.

¶ 28　　　　Here, the evidence showed respondent was not close to having the minor children returned to her during the relevant nine-month period. While respondent made progress early in the nine-month period and was going to receive unsupervised visitation with the minor children, the case manager did not change respondent's visitation because of safety concerns as a result of Keontae's arrest and possession of a controlled substance at respondent's residence. Respondent

denied being in a relationship with Keontae, but she was pregnant with his child during the nine-month period. Respondent was also incarcerated for 30 days during the nine-month period and did not consistently engage in counseling after her release from jail. Her counseling services were also extended during the relevant nine-month period due to concerns about respondent's ability to provide a safe environment. We disagree with respondent's suggestion her incarceration, pregnancy, and frustration over an extension of her services excuse her failure to make progress towards the minor children's return during the relevant nine-month period. Accordingly, the circuit court's finding respondent was unfit based on failure to make reasonable progress was not against the manifest weight of the evidence.

¶ 29        Since we have upheld the circuit court's determination respondent met the statutory definition of an "unfit person" on the basis of respondent's failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2018)), we do not address the other basis for respondent's unfitness finding. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891, 819 N.E.2d 813, 820 (2004).

¶ 30                          B. Minor Children's Best Interests

¶ 31        Respondent also challenges the circuit court's finding it was in the minor children's best interests to terminate her parental rights. The State disagrees and contends the court's finding was proper.

¶ 32        During the best interests hearing, the circuit court focuses on "the child[ren]'s welfare and whether termination would improve the child[ren]'s future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772, 784 N.E.2d 304, 309 (2002). In doing so, the court considers the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2018)) in the context of the children's age and developmental

needs.  See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005).  Those factors include the following:  the children's physical safety and welfare; the development of the children's identity; the children's family, cultural, and religious background and ties; the children's sense of attachments, including continuity of affection for the children, the children's feelings of love, being valued, security, and familiarity, and taking into account the least disruptive placement for the children; the children's own wishes and long-term goals; the children's community ties, including church, school, and friends; the children's need for permanence, which includes the children's need for stability and continuity of relationships with parent figures, siblings, and other relatives; the uniqueness of every family and each child; the risks attendant to entering and being in substitute care; and the wishes of the persons available to care for the children.  705 ILCS 405/1-3(4.05) (West 2018).

¶ 33        We note a parent's unfitness to have custody of his or her children does not automatically result in the termination of the parent's legal relationship with the children.  *In re M.F.*, 326 Ill. App. 3d 1110, 1115, 762 N.E.2d 701, 706 (2002).  As stated, the State must prove by a preponderance of the evidence the termination of parental rights is in the minor children's best interests.  See *D.T.*, 212 Ill. 2d at 366, 818 N.E.2d at 1228.  "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not."  *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 34        In this case, the best interests factors all favor termination of respondent's parental rights.  D.H. had been in the care of his maternal grandmother his entire life, and K.H. had been in her care for half of his life.  The minor children were bonded with their grandmother, who desired to adopt them.  The maternal grandmother also allowed the minor children to visit with their mother safely and appropriately.  Thus, if respondent retains her parental rights to her

infant, the minor children will still be able to have a relationship with the infant. While we commend respondent on the progress she made recently on her services, the minor children are entitled to permanency. Three years is a long time in foster care. Given respondent's prior inconsistency in making safe decisions, a definite risk exists she will not stay on the straight and narrow path if given another six months to prove her ability to safely parent the minor children. Additionally, both the case manager and guardian *ad litem* recommended termination of respondent's parental rights.

¶ 35    Accordingly, we find the circuit court's conclusion it was in the minor children's best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 36                                III. CONCLUSION

¶ 37    For the reasons stated, we affirm the Champaign County circuit court's judgment.

¶ 38    Affirmed.