NOTICE

Decision filed 01/12/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 210178-U

NOS. 5-21-0178, 5-21-0179, 5-21-0180 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* GRACELYNN W., BENTLEY B., and JORDAN W., Minors | ) ) ) | Appeal from the Circuit Court of Fayette County. |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | |
| v. | ) ) | Nos. 18-JA-55, 18-JA-56, 18-JA-57 |
| Sabrina W., | ) ) | |
| Respondent-Appellant). | ) ) | Honorable M. Don Sheafor Jr., Judge, presiding. |

JUSTICE BARBERIS delivered the judgment of the court.
Presiding Justice Boie and Justice Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*: Termination of respondent's parental rights is affirmed where the trial court's unfitness findings and best-interest determinations were not against the manifest weight of the evidence.

¶ 2   In this consolidated appeal, respondent, Sabrina W. (Mother), appeals from the judgment of the trial court of Fayette County finding her unfit and terminating her

1

parental rights to her three minor children, Gracelynn W., Bentley B., and Jordan W. For the following reasons, we affirm.[1]

¶ 3                                    I. Background

¶ 4     Mother has three minor children that are the subjects of this consolidated appeal, Bentley B. (born October 15, 2014), Gracelynn W. (born January 14, 2017), and Jordan W. (born March 1, 2018).[2] Although the children's respective fathers were respondents in the trial court proceedings, they are not parties to this appeal.

¶ 5     On September 26, 2018, Mother took the children to visit a relative in Greenville, Illinois. During the visit, the relative noticed visible injuries on the children and made a report to Greenville police. Greenville police notified the Illinois Department of Children and Family Services (DCFS) of the report.

¶ 6     The next day, September 27, 2018, a DCFS investigator traveled to Mother's house in Vandalia, Illinois, to observe the children. The DCFS investigator initially observed that Mother had no shoes for Bentley B. and Gracelynn W. and that all of the children had poor hygiene (*i.e.*, wearing dirty clothes and had a foul odor). The DCFS investigator also observed various injuries on Bentley B. and Jordan W. Bentley B. had a bruise on his chest, a small laceration under his left eye, and a swollen cut on his right index finger. Jordan W. had two dime-sized, circular, red, inflamed areas on his arm that

---

[1]This appeal involves a final order terminating parental rights. Illinois Supreme Court Rule 311(a)(5) (eff. Feb. 26, 2010) requires that, except for good cause shown, the appellate court issue its decision within 150 days of the filing of the notice of appeal. Here, the decision was due November 12, 2021. However, we granted Mother an extension of time to file her brief due to a delay in receiving the record. We also granted one final 10-day extension to allow Mother to finalize her brief. Under these circumstances, we find good cause to issue our decision after the 150-day deadline.

[2]Mother's two oldest children and her youngest child, Ryker S., born during the pendency of these cases, are not the subjects of this appeal.

were consistent with cigarette burns. Additionally, the DCFS investigator observed that Mother's house was unsanitary and had no running water. The DCFS investigator further observed that there was minimal food and no baby formula in the house. As a result, the DCFS investigator took the children into protective custody.

¶ 7    On October 1, 2018, the State filed three separate juvenile petitions with respect to Gracelynn W. (18-JA-55), Bentley B. (18-JA-56), and Jordan W. (18-JA-57),[3] requesting the trial court to adjudicate each child a ward of the court. In each of the petitions, the State first alleged that the minor was neglected as defined in section 2-3(1)(a) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a) (West 2018)) in that the minor was not receiving proper medical or remedial care and other care necessary for his/her well-being, including adequate food, clothing, and shelter. In support, the State included a summary of the DCFS investigator's alleged observations concerning the children and their living conditions during the September 27, 2018, visit. The State further alleged that after coming into protective custody on September 27, 2018, the children were given physicals, which revealed Bentley B. had a bruised eye, older bruises on his chest, scrapes to his lower legs, and a cut on his finger that "probably should have had stitches."

¶ 8    In addition, the State alleged in each of the petitions that the minor was neglected, as defined in section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)), in that the minor's environment was injurious to his/her welfare. In support, the State alleged, *inter alia*, that Mother had not picked up WIC coupons for Gracelynn W.'s formula since July 2018;

_____

[3]Although this appeal is limited to Bentley B., Gracelynn W., and Jordan W., we have included certain details in the factual recitation involving Mother's other children and their respective fathers as needed for a clear understanding of the issues presented.

there was a history of domestic violence between Mother and Caleb W. (the father of Gracelynn W. and Jordan W.); Mother was "abusing meth IV, pain pills and alcohol"; and on September 4, 2018, Mother, apparently under the influence of alcohol and drugs while caring for the children, was reportedly passed out on a couch.

¶ 9 Prior to the October 1, 2018, shelter care hearing, the trial court entered an order appointing attorney Bill Starnes as guardian *ad litem* (GAL) for the children. During the shelter care hearing, Mother appeared without legal counsel and agreed to an order placing the children in the temporary custody of DCFS. After the State provided a factual basis for the petitions, the court found probable cause that the children were neglected and that there was an immediate and urgent necessity to remove the children from the home. The court granted DCFS temporary guardianship and custody of the children.

¶ 10 On October 4, 2018, DCFS filed a parent-child visitation and contact plan in all three cases, providing for two-hour weekly visits between Mother and the children at the DCFS office. In accordance with the plans, Mother was required to provide DCFS with notice of a cancellation at least 24 hours in advance of a scheduled visit. DCFS was to provide transportation for Mother and her children to facilitate the visits.

¶ 11 On October 25, 2018, DCFS filed an integrated assessment (IA) report prepared by the DCFS Integrated Assessment Team, comprised of Sarah Davison, a child welfare specialist, and Denise Burke, an integrated assessment clinical screener. The IA report documented Mother's work history, previous DCFS involvement, mental and emotional health, mental and behavioral status, and current symptoms. The purpose of the IA was to address the reasons the children came into care and to identify services that Mother

4

needed to complete before the children could be returned to her care. In conducting the IA, the Integrated Assessment Team relied on the case record from the Statewide Automated Child Welfare Information System (SACWIS), interviews of Mother and the children's family members and/or caretakers, medical records, and assessment tools, such as Child and Adolescent Needs and Strength (CANS) assessment and Devereux Early Childhood Assessment (DECA).

¶ 12 According to the IA report, Mother missed a visit and the first scheduled IA appointment because she was "not available for pick up by the scheduled driver" on October 15, 2018. When Mother was interviewed by the Integrated Assessment Team the following day, October 16, 2018, Mother reported that she had missed the first appointment because "she has been moving and lost track of her days." It was noted that Mother had also missed a scheduled drug screening and, contrary to the earlier reports, she had reported in her interview only a "little drug or alcohol use."

¶ 13 At the time of the IA, Mother, who was 26 years old, had five children with no previous indicated reports recorded in the SACWIS. Mother explained that her two oldest children resided with their father, who had served time in prison for armed robbery, drug-related offenses, and domestic violence against Mother.

¶ 14 Mother was married to Caleb W., but she reported that she was ending their marriage. According to Mother, Caleb W. was physically violent toward her. She claimed he had "choked and hit her in the face more than once" and "caved" her face in and broke her ribs. The IA report noted significant domestic violence concerns with a high "risk of violence reoccurring," which was supported by the SACWIS report. The SACWIS report

5

included various police reports of domestic violence between Mother and Caleb W., including a recent report of domestic violence that resulted in Caleb W.'s arrest by Vandalia police on September 15, 2018. Following his arrest, Caleb W. was released on bond with a no contact provision.

¶ 15   Concerning her work history, Mother provided in-home care for "Glenn," a paralyzed man, for the previous five years. However, Glenn had recently moved to Mother's current residence, her grandmother's house in Vandalia, and he was "now paying the household bills and does not formally pay her in cash."

¶ 16   Additionally, the IA report noted several serious concerns regarding the children's medical needs. Mother failed to obtain immunizations for Gracelynn W. and Jordan W. and medical records revealed that Jordan W. had not seen a physician since his well-child check-up on April 18, 2018. Mother claimed that she had not kept up with the children's immunizations due to the strain of being in a physically abusive marriage and the death of her grandmother. Jordan W.'s medical records also revealed that he had an abnormal screen for maple syrup urine disease, a significant health condition that can result in kidney failure. Jordan W.'s physician and nurse assisted Mother in obtaining an emergency medical card from public aid so Jordan W. could undergo additional testing. Mother, however, failed to keep all follow-up medical appointments, and she minimized this health concern in her interview. Additionally, according to the SACWIS report, "[Jordan W.] had definite cig burns to his right arm *** with depth and inflicted nonaccidental." The IA report also noted that Gracelynn W. and Jordan W. had "extremely flat heads," which was an indication that the children were spending long

durations in their beds or in car seats. The IA report further noted that each child underwent a DECA. According to the DECA, "all of the children reflected areas of need," and Gracelynn W. and Jordan W. had "developmental concerns."

¶ 17   According to Mother's CANS assessment, it was recommended that she complete a psychological evaluation after obtaining sobriety for six months, a substance abuse assessment, and a psychological consultation. The IA report recommended that Mother undergo individual psychotherapy focused on grief, domestic violence, and past trauma, participate in parenting education and domestic violence services, and maintain stable housing. Mother was requested to share the IA report with treatment providers.

¶ 18   The IA report also included "Participant Assessment Information" (PAI) reports concerning each of the children. Bentley B.'s PAI report included, *inter alia*, concerns related to attention deficit disorder (ADD). Although referrals for ADD testing were made, Mother failed to follow through and no testing was completed. The early childhood assessment for preschoolers placed Bentley B. "at risk" of "social-emotional delay." Gracelynn W.'s PAI report included, *inter alia*, the following:

> "On this date for this screening, Gracelynn [W.] had no communication skills listed for her age and stage of development. She cannot point to a picture in a book, she cannot point to her nose or eyes, she does not follow simple verbal commands, she does not use two words together, she does not say 15 words in total and does not use words like mine or me. In the area of problem solving, she was unable to color or scribble on a page, line two blocks in a row, pretend, or draw a line on the paper. In the area of fine motor, she was unable to string beads

or stack blocks. In the area of personal-social[,] she did not follow cues to copy gestures and only sometimes drink [*sic*] from a cup without spilling or push a wagon or stroller."

Jordan W.'s PAI report included, *inter alia*, that he was developmentally delayed for a child of his age. The early childhood assessment for infants placed Jordan W. "at risk" of "social-emotional delay."

¶ 19 On November 8, 2018, DCFS filed a family service plan in Bentley B.'s case, establishing Mother's recommended services and goals. Under the plan, Mother was to accomplish specific tasks and goals in the areas of substance abuse, domestic violence, parenting, mental health, housing, and employment. The targeted completion date for all services was September 27, 2019, and the recommended permanency goal was return home within 12 months.

¶ 20 On December 13, 2018, the trial court held an adjudicatory hearing, but Mother failed to appear. The trial court subsequently entered a default judgment against Mother on December 20, 2018, in which the court found the minors neglected as defined in sections 2-3(1)(a) (lack of care) and 2-3(1)(b) (environment injurious) of the Act (*id*. §§ 2-3(1)(a), (1)(b)), as a result of neglect inflicted by Mother and Caleb W. The court set the dispositional hearing on January 24, 2019.

¶ 21 On January 4, 2019, DCFS filed a family service plan in both Gracelynn W.'s and Jordan W.'s cases. Under the plan, Mother was to accomplish the same specific tasks and goals listed in the November 8, 2018, family service plan filed in Bentley B.'s case. The

recommended permanency goal for Gracelynn W. and Jordan W. was return home within 12 months.

¶ 22　On January 10, 2019, in anticipation of a dispositional hearing, Sarah Davison, a DCFS child welfare specialist, filed dispositional reports for the children. The dispositional reports generally repeated the same information contained in the October 25, 2018, IA report and the PAI reports. The dispositional reports included DCFS's recommendations to the trial court, which included, *inter alia*, that (1) the court find the parents unfit, unable, and unwilling to care for, protect, train, educate, supervise, or discipline the minors and placement with them is contrary to the health, safety, and best interests of the minors; (2) the minors be made wards of the court; and (3) guardianship of the minors be granted to DCFS.

¶ 23　On January 24, 2019, the trial court held a dispositional hearing involving the three children. Mother was present with counsel. Davison, the sole testifying witness at the hearing, testified as follows. Davison was a child welfare specialist and the assigned caseworker from the date the children were placed in protective custody. Mother's visitation with the children was initially once a week for two hours in the DCFS field office. However, Mother had only attended two visits, so visitation had been reduced to twice a month until she demonstrated regular attendance. Mother last visited the children on November 7, 2018, nearly three months before the dispositional hearing.

¶ 24　Davison confirmed that Mother had received the family service plan for the three children but refused to follow it or sign consents for referrals. Despite repeated attempts, Davison was unable to make regular contact with Mother and unable to inspect Mother's

residence, from which the children were removed. A few weeks prior to the hearing, Mother sent Davison a text claiming to be employed but then refused to respond when Davison asked her to identify the employer and work schedule.

¶ 25    Davison next testified that the children's needs were being met while in foster care. The children were presently placed in three separate foster homes. Initially, Bentley B. and Jordan W. were placed together, but Bentley B. was later placed in specialized care due to his disruptive and violent behaviors. The other two children were receiving services for developmental and speech delays, and Jordan W. was prescribed a medical helmet to wear because the back of his head was flat.

¶ 26    On January 30, 2019, following the dispositional hearing, the trial court entered a dispositional order adjudicating the minors wards of the court and placing custody and guardianship with DCFS. The court further ordered DCFS to prepare a service plan with a permanency goal consistent with the court's findings. Additionally, on that same day, the court entered a permanency order in all three of the children's cases, finding that DCFS had made reasonable efforts in providing services and setting the permanency goal as "return home within 12 months." The court also set the date for the next permanency review hearing.

¶ 27    On March 28, 2019, DCFS filed an updated family service plan, which indicated that Mother had not engaged in services. The plan included an admonishment that "[i]f the parents cannot make satisfactory progress towards the return home goal, case will be taken to legal screening to pursue termination of parental rights and seek adoption."

10

¶ 28　On June 27, 2019, DCFS filed a permanency report concerning Mother, Caleb W., Gracelynn W., and Jordan W. The report reflected that Mother had not engaged in any services, or signed consents, and had failed to keep an appointment for a psychological evaluation. Since the January 24, 2019, dispositional hearing, Mother had missed 6 out of 10 bimonthly visits and frequently appeared 30 minutes to one hour late for her two-hour visits. On one occasion, she arrived with only five minutes left for the visit. Mother had refused drug tests and was also arrested for possession of methamphetamine, possession of a controlled substance, and bringing a controlled substance and marijuana into a penal institution on March 29, 2019.

¶ 29　The permanency report also reflected that Gracelynn W. and Jordan W. were each thriving in their foster placements. Both children were developmentally delayed, but DCFS was providing them with specialized services. The children were healthy and had received their immunizations.

¶ 30　On July 11, 2019, Lutheran Child and Family Services of Illinois (LCFS) filed a permanency report concerning Bentley B., who was four years old at that time. LCFS was managing Bentley B.'s case, rather than DCFS, because Bentley B. required specialized foster care due to his behavior. According to the report, Bentley B. was placed in a traditional foster home and was receiving specialized services. It was noted that Bentley B. had "sexual problematic" and "self-harming" behaviors. He also frequently urinated in bed and on flooring, hit others, injured himself by biting, and used profanity.

11

¶ 31    On July 23, 2019, following a hearing, the trial court entered permanency orders in all three cases. The court set the permanency goal for all three children as return home within 12 months[4] and found that DCFS had made reasonable efforts in providing service to facilitate achievement of the permanency goal. The court also found that Mother had not made substantial progress towards the goal of return home.

¶ 32    On September 12, 2019, DCFS again filed a family service plan, which indicated that Mother still had not engaged in services and was not attending the visits on a regular basis. Additionally, Mother had pending charges—theft by deception of less than $500, the four drug-related charges from March 29, 2019, and possession of a stolen vehicle. Mother had refused all random drug tests.

¶ 33    On November 21, 2019, the State filed a petition to terminate parental rights in Gracelynn W.'s and Jordan W.'s cases, which was replaced by an amended petition to terminate parental rights to correct scrivener's errors and to correctly identify the DCFS guardianship administrator on November 22, 2019. Concerning Mother, the amended petition alleged four grounds of parental unfitness as defined in the Adoption Act (750 ILCS 50/1 *et seq.* (West 2018)). Specifically, (1) failure to maintain a reasonable degree of interest, concern, or responsibility as to the child's welfare (*id.* § 1(D)(b)); (2) failure to protect the child from conditions within his environment injurious to the child's welfare (*id.* § 1(D)(g)); (3) failure by a parent to make reasonable efforts to correct the

---

[4]The preprinted permanency orders also showed the boxes checked for a permanency goal of "SUBSTITUTE CARE—PENDING INDEPENDENCE." However, the permanency goal of return home within 12 months was repeated in the orders and specifically added, in all capital letters, to the last page of the orders.

conditions that were the basis for the removal of the child from the parent during the nine-month time frame of December 21, 2018, to September 21, 2019, following the adjudication of neglect (*id.* § 1(D)(m)(i)); and (4) failure by a parent to make reasonable progress toward the return of the child to the parent during the nine-month time frame of December 21, 2018, to September 21, 2019, following the adjudication of neglect (*id.* § 1(D)(m)(ii)).

¶ 34    On December 19, 2019, DCFS filed a permanency report, which recommended changing the permanency goals for Gracelynn W. and Jordan W. to substitute care pending court determination of termination of parental rights. The stated reasons for the goal change were that Mother had not engaged in services and Caleb W. was serving a six-year prison sentence.

¶ 35    According to the report, the State filed a petition to terminate parental rights in Gracelynn W.'s and Jordan W.'s cases on November 22, 2019. However, Bentley B.'s caseworker did not have the "full packet," at the time of screenings, so Bentley B.'s case was not screened. Mother signed DCFS referral consent forms on September 10, 2019, but she repeatedly refused all random drug tests. It was noted that Mother was reportedly receiving services through the Community Resource Center (CRC); however, the CRC reported that Mother appeared to be under the influence when she presented to the CRC for an assessment on October 23, 2019, and that Mother subsequently missed two rescheduled visits. Moreover, Mother missed 6 of 11 bimonthly visits since the July permanency hearing. Due to numerous arrests, she was "in and out of jail in July, August, and September being release[d] on October 21, [2019]."

¶ 36   On January 9, 2020, the trial court held a status hearing regarding all three children. Regarding Gracelynn W. and Jordan W., the court set a date for hearing on the State's request to change the permanency goals. The court also set Bentley B.'s case for a status hearing.

¶ 37   On March 13, 2020, DCFS again filed a family service plan, which remained unchanged since the September 12, 2019, service plan. It was noted that Mother's criminal charges remained pending, and she continued to refuse drug testing.

¶ 38   On April 20, 2020, LCFS filed a permanency report regarding Bentley B. The report erroneously stated that Mother's parental rights to Gracelynn W. and Jordan W. had been terminated, rather than stating that a petition to terminate parental rights had been filed. The report further stated that Bentley B.'s case needed to be sent to legal screening for termination of parental rights due to the parents' noncompliance with their required services.

¶ 39   On July 16, 2020, the trial court entered a "REASONABLE EFFORTS ORDER" in all three cases, finding that the services contained in the previous service plans were appropriate and placement of the children with DCFS was necessary. In addition, the court found that DCFS had made reasonable efforts in providing services to facilitate the achievement of the permanency goal through July 16, 2020.

¶ 40   On August 20, 2020, following continuances for various reasons, the trial court conducted a permanency review hearing in all three cases via Zoom. Bentley B.'s LCFS caseworker did not attend. The court reset the hearing for October 1, 2020, and ordered the caseworker to submit Bentley B.'s case for a legal screening and to appear at the next

14

hearing or face possible contempt proceedings. Shortly thereafter, in compliance with the court's order, the caseworker presented Bentley B.'s case for a legal screening.

¶ 41    On September 30, 2020, the State filed a petition to terminate parental rights in Bentley B.'s case. The State alleged the same four grounds of parental unfitness against Mother as alleged in the November 21, 2019, petition regarding Gracelynn W. and Jordan W. However, at the October 1, 2020, hearing, the trial court ruled that the cases could not proceed to termination until the permanency goals were changed from return home to substitute care. The court set the matter for a hearing on the goal changes on October 29, 2020.

¶ 42    On October 29, 2020, the trial court conducted a hearing regarding the goal changes. Mother failed to appear, and her counsel announced that he had no contact with her leading up to the hearing despite numerous attempts. After Mother's counsel's request for a continuance was denied, the State called Davison, who testified to the following.

¶ 43    Even though the children had been in DCFS's care for two years, Mother had not made progress or even engaged in any services. Davison asserted that the goal change to substitute care was needed to provide permanency for the children. Mother attended less than half of her visits and had refused all drug screening. The children were bonded to their foster parents.

¶ 44    Following the hearing, the trial court ordered the permanency goal changed to substitute care pending termination of parental rights. The court noted that the children

15

had been in care for two years, Mother had repeatedly failed to appear or cooperate with DCFS, and Caleb W. was serving a prison sentence.

¶ 45   On November 2, 2020, DCFS filed a family service plan, which reported that Mother had failed to maintain regular visits with the children and contact with DCFS. Mother had yet to engage in any services and her criminal charges remained pending.

¶ 46   On November 25, 2020, following the permanency goal change, the State filed a second amended petition to terminate parental rights regarding Gracelynn W. and Jordan W., and an amended petition to terminate parental rights regarding Bentley B. The petitions each provided the dates of adjudication, disposition, and that all of the children were made court wards and placed in DCFS's guardianship. The petitions alleged the same four grounds of parental unfitness against Mother as contained in the earlier petitions.

¶ 47   On December 3, 2020, Mother failed to appear for her first appearance on the petitions to terminate parental rights. Mother subsequently arrived late to the pretrial hearing on February 4, 2021, which was held via Zoom. Because Mother appeared to be under the influence, the trial court ordered Mother to report to the Fayette County Probation Department for a drug test. The Fayette County Probation Department later reported that Mother's drug test was positive for methamphetamine.

¶ 48   On March 4, 2021, the trial court conducted a parental fitness hearing on the consolidated petitions to terminate parental rights regarding all three children. At that time, Mother was incarcerated in the Fayette County jail and appeared via the county's

16

closed circuit system. At the start of the hearing, the court took judicial notice of the court files.

¶ 49 Davison testified as to the reasons the children were taken into care on September 27, 2018, and identified Mother's recommended tasks as listed in the family service plans. She testified that Mother had not completed any of the recommended tasks or engaged in any services. Despite having been provided transportation by DCFS, Mother attended less than half of the visits, and there were some months where she missed both bimonthly visits. Davison explained that no more than five visits were cancelled due to issues with the transportation service provider, such as mechanical trouble or weather concerns, and all cancelled visits were rescheduled for a later date.

¶ 50 Davison further testified that Mother had six children, including a newborn son, Ryker S., who was born with several controlled substances in his system on December 17, 2020, and that Mother's six children had been placed in DCFS's care. Davison arranged for Mother to undergo random drug tests during the scheduled visitation visits, but Mother either failed to appear or refused the tests.

¶ 51 On cross-examination, Davison admitted that an advocate with Addus Family Services had occasionally supervised Mother's visits and that Davison last supervised Mother in December 2020, after Ryker S. was taken into care. Davison also acknowledged that one visit was cancelled due to Covid-19-related concerns with one of the children.

¶ 52 Davison admitted that Mother tested negative for controlled substances following Ryker S.'s birth. Davison also confirmed that she had not visited Mother's residence

since the start of the Covid-19 pandemic. However, Davison explained that Mother was rated "unsatisfactory" in the area of housing, due to her failure to cooperate with the housing advocate, not necessarily because of the condition of her residence. Concerning Mother's employment, Davison testified that Mother was unemployed at the time of the parental fitness hearing but was previously self-employed providing housecleaning and home-care services. Davison further explained that Mother was rated "unsatisfactory," due to Mother's failure to provide proof of income.

¶ 53 Mother testified on her own behalf. Mother testified that she was presently incarcerated in the county jail on a failure to appear warrant. Mother testified that she was a self-employed housekeeper and home caretaker. Mother further testified that she had previously "complied and completed everything" regarding her previous intact family case, which involved her two oldest children. Mother's intact family case predated the cases involving Bentley B., Gracelynn W., and Jordan W.

¶ 54 According to Mother, Davison visited Mother's home one time in 2019 but refused Mother's subsequent invitations to visit. Mother had received Covid-19 pandemic-related unemployment benefits, which were backdated and paid in one lump sum of $20,000. She was planning on using the money to make home repairs, including replacing copper wire that had been stolen while she was incarcerated. Mother claimed that her hostile relationship with Davison hindered her "ability to work the service plan." Mother also expressed her lack of understanding as to why she had to complete services when she had completed "everything" that she was supposed to do in her prior intact case

18

involving her two oldest children. Mother testified that she had received the service plan from Davison and was familiar with the requirements.

¶ 55 On cross-examination, Mother claimed that she had requested services at the CRC three or four times. She admitted to not completing any treatment after DCFS removed her children. Mother denied having a drug problem before her children were removed in September 2018, but admitted to having a drug problem after they were removed. She admitted to using marijuana and fentanyl during her pregnancy with Ryker S. She further denied failing her most recent court-ordered drug test but acknowledged that she had pending felony drug charges and a felony charge for possession of a stolen motor vehicle.

¶ 56 Following arguments of counsel, the trial court clarified for the record that Mother was in jail at the time of the parental fitness hearing because it had previously ordered her to take a drug test and not to leave until the results were returned. After Mother left without waiting for the results, the court issued a warrant for her arrest.

¶ 57 Next, the trial court entered an order finding that the State had proven Mother unfit by clear and convincing evidence as to all three children. Specifically, the court found that Mother had failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the children, and to make both reasonable efforts and reasonable progress between December 21, 2018, and September 21, 2019. See *id*. §§ 1(D)(b), (D)(m)(i), (D)(m)(ii). The court found that the State had failed to prove Mother unfit based on the grounds of failure to protect the child from conditions within his environment injurious to the children's welfare. See *id*. § 1(D)(g). The court stated the service plan was established and Mother had more than two years "to try to do

19

something," but she did not have enough interest in the children and was unfit to care for them.

¶ 58  On May 13, 2021, the trial court held the hearing on best interests of the children. At the time of the hearing, Gracelynn W. was four years old, Jordan W. was three years old, and Bentley B. was six or seven years old. Davison first testified that Gracelynn W. "has come a long way" since her placement in foster care and that Gracelynn W. was developmentally "on target and doing well." Gracelynn W. was healthy, outspoken, and her speech had improved. Gracelynn W. had bonded to her foster parents and their three children as well as their extended family. Davison testified that the foster parents desired to adopt Gracelynn W. and were financially able to support her.

¶ 59  On cross-examination, Davison admitted that Mother had recently completed an assessment through the CRC, began domestic violence counseling through SWAN in the past month, and was on a waitlist for parenting classes. According to Davison, Mother missed all February 2021 visits due to her incarceration in the county jail. Davison denied that the children were bonded to Mother. Davison acknowledged that Gracelynn W. and Jordan W. were placed in separate foster homes, approximately 25 miles apart, and would attend different schools. Davison explained that DCFS initially placed all three children in the same relatives' foster home, but the relatives complained that it was "too much for them" and requested the children be removed from their placement. Additionally, other relatives who came forward failed the placement clearance.

¶ 60   On redirect examination, Davison testified that Jordan W.'s foster parent also desired to adopt him. Davison testified that both foster homes were stable, and that the children's foster homes provided a loving and caring environment.

¶ 61   Jasmine Hurley, Bentley B.'s assigned LCFS caseworker, was the next witness. Hurley testified that she had been a caseworker since July 2021. Bentley B. was initially placed with his maternal grandmother, but she became overwhelmed after approximately seven months and asked LCFS to remove Bentley B. from her home. Hurley testified that Bentley B. was "doing extremely well" in his foster placement. The foster parent met all of Bentley B.'s needs, "emotionally, medically, school-wise" and ensures that he attends his counseling and "all of that." Hurley further testified that the foster parent was not ready to commit to an adoption but had not "precluded" it.

¶ 62   On cross-examination, Hurley testified that the foster parents had three other children in the home, a 9-year-old foster child, a 14-year-old adopted child, and a 15-year-old adopted child. Bentley B. was closer to his nine-year-old foster brother.

¶ 63   Next, the State called Ashley K., Gracelynn W.'s foster parent, to testify. Ashley K. had been Gracelynn W.'s foster parent since September 2018 when Gracelynn W. was approximately 20 months old. Ashley K. worked as a counselor for a local school and her husband worked in sales. Ashley K. had a four-bedroom home with plenty of space for Gracelynn W.

¶ 64   Ashley K. testified that Gracelynn W. suffered trauma before and after her visits with Mother and Caleb W. Ashley K. explained that Gracelynn W. would sometimes hide her shoes to avoid the visits. Gracelynn W. was also defiant and would throw things.

21

Ashley K. testified that Gracelynn W.'s behavior before and after the visits worsened as Gracelynn W. became older.

¶ 65    On cross-examination, Ashley K. testified that Gracelynn W. would yell, hit her teachers and other preschool children, put things in the toilet, and be very defiant following visits with Mother. Gracelynn W. called Ashley K. "mommy" and Ashley K.'s husband "daddy." Ashley K. confirmed that she and her husband wanted to adopt Gracelynn W.

¶ 66    Next, Ashley D., Jordan W.'s foster parent, testified that she resided with her husband and two foster children, Jordan W. and Ryker S. Ashley D. was a case manager for One Hope United and her husband worked as a minister for a local church. Ashley D. confirmed that she and her husband wanted to adopt Jordan W. and Ryker S. Ashley D. further testified that Jordan W.'s emotions changed when he had visitation with Mother. When Jordon W. returned from the visits, he was defiant and acted out, and it would usually take a couple of days for him to return to normal.

¶ 67    On cross-examination, Ashley D. explained that Bentley B. was initially placed in her care but had to be removed due to his need for specialized care and safety concerns for the other children. Ashley D. confirmed that Jordan W.'s needs were being met, and he had bonded with his foster parents and Ryker S.

¶ 68    Mother was called to testify on her own behalf. Prior to the children's removal from her custody, she was the children's primary caretaker with little help from Caleb W. Mother testified that she had regularly attended visits with the children following the Covid-related suspension. Mother claimed that the children were happy to see her at the

22

visits and that Gracelynn was verbal when she was taken into care. Mother denied not taking the children to their doctor's appointments.

¶ 69    Mother next testified, consistent with Davison's testimony, that she began services after the parental fitness hearing. Mother acknowledged that she was on probation and was required to submit to random drug tests.

¶ 70    On cross-examination, Mother testified that she could not recall why the children needed to be caught up on their immunizations when they came into care. The State, referencing the 2½ years that the children had been in care, asked Mother the following: "So why is it that now you're willing to do all the things that were necessary when you weren't then?" Mother responded, "I don't have an answer for that." Mother claimed that the doctors never informed her that the children had flat heads.

¶ 71    The trial court later interrupted the GAL's cross-examination and the following discussion occurred:

> "THE COURT: Mr. Starnes, I don't understand this at all.
>     Ma'am, stop. I want to know how many children you've had, and you can't seem to explain it ***.
>     MS. DAVISON: She has six children. The children that we're here for today [are] [Bentley B.], [Gracelynn W.], and [Jordan W.]. Those three came into care September of 2018. That's who we're here for today. She had two older children *** who then went to live with their dad, who then came into DCFS care in June, I believe, June of 2020. She gave birth to Ryker S. in December of 2020, who then also came into DCFS custody.
>     THE COURT: Thank you very much."

Mother then confirmed the accuracy of Davison's comments. Mother also testified that Caleb W. filed for divorce, which was finalized in January 2020. Mother admitted that she was on probation but had not been drug tested.

23

¶ 72　Ryan Parks, a Fayette County probation officer, testified to the following. Parks, who was Mother's probation officer, had not drug tested Mother during the three months she had been on probation. Parks explained that he had not met Mother because she had failed to appear for her appointments on March 29, 2021, April 21, 2021, and May 12, 2021. Parks explained that part of the intake process involved drug testing, but it was unclear whether Mother was aware of the drug testing during the intake.

¶ 73　Following arguments of counsel, the GAL recommended to the trial court that Mother's parental rights be terminated. The court then ruled that it was in the best interests of all three children to terminate Mother's parental rights. The court entered written orders terminating the parental rights of Mother, Caleb W., and all unknown fathers, along with permanency orders changing the permanency goals for all three children to adoption on May 17, 2021. Mother appealed.

¶ 74　　　　　　　　　　　　II. Analysis

¶ 75　On appeal, Mother first challenges the trial court's finding of unfitness. We note that the court found Mother to be an unfit person to care for Bentley B., Gracelynn W., and Jordan W. based on three grounds of unfitness provided in the Adoption Act. See 750 ILCS 50/1(D)(b), (D)(m)(i), (D)(m)(ii) (West 2018).

¶ 76　"[T]ermination of parental rights is an extraordinarily serious matter." *In re M.F.*, 304 Ill. App. 3d 236, 238 (1999). "The termination of parental rights constitutes a permanent and complete severance of the parent-child relationship." *In re C.N.*, 196 Ill. 2d 181, 208 (2001). Termination of parental rights proceedings are governed by the Act (705 ILCS 405/1-1 *et seq.* (West 2018)) and the Adoption Act (750 ILCS

24

50/0.01 *et seq.* (West 2018)). *In re J.L.*, 236 Ill. 2d 329, 337 (2010). A petition to terminate parental rights is filed under section 2-29 of the Act, which establishes a two-step process for the involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2018); *In re J.L.*, 236 Ill. 2d at 337.

¶ 77    In the first step, the State must prove, by clear and convincing evidence, that the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). 705 ILCS 405/2-29(2), (4) (West 2018); *In re J.L.*, 236 Ill. 2d at 337. A finding of parental unfitness will not be disturbed unless it is against the manifest weight of the evidence. *In re R.L.*, 352 Ill. App. 3d 985, 998 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 78    Section 1(D) of the Adoption Act sets forth the grounds of unfitness. 750 ILCS 50/1(D) (West 2018). Where, as here, the State relies on several grounds in its petition, "a finding adverse to the parent on any *one* ground is sufficient to support a subsequent termination of parental rights." (Emphasis in original.) *In re C.W.*, 199 Ill. 2d 198, 217 (2002). One of the grounds of parental unfitness listed under section 1(D) is the failure by a parent to make reasonable progress toward the return of the child during any nine-month period after an adjudication of neglected, abused, or dependent (see 750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 79    "Reasonable progress is an objective standard, focusing on the amount of progress toward the goal of reunification one can reasonably expect under the circumstances."

25

(Emphasis omitted.) *In re C.M.*, 305 Ill. App. 3d 154, 164 (1999). Reasonable progress requires, at a minimum, measurable or demonstrable movement toward the goal of reunification. *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 21. Illinois courts have explained reasonable progress as follows:

> " '[T]he benchmark for measuring a parent's 'progress toward the return of the child' under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child[ren], and in light of other conditions which later became known and which would prevent the court from returning custody of the child[ren] to the parent.' " *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007) (quoting *In re C.N.*, 196 Ill. 2d at 216-17).

"Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006).

¶ 80    In the present case, the trial court found Mother had failed to make reasonable progress toward the return of her children from December 21, 2018, through September 21, 2019, which is the first nine-month period following the entry of the default judgment finding the minors neglected. The evidence presented at the fitness hearing overwhelmingly supports the court's finding. At the time DCFS removed the children from Mother's care, the living conditions were unsanitary, the home had no running water, and there were minimal amounts of food for all the children. The children suffered

from a lack of basic care and were developmentally delayed. Mother was abusing controlled substances, including methamphetamines and alcohol.

¶ 81 Mother completed an IA on October 16, 2018, which identified services Mother needed to complete before her children were returned to her care. Following the IA, family service plans were filed with the trial court on November 8, 2018, and January 4, 2019, with targeted completion dates by Mother of September 27, 2019. Consistent with the family service plans, Davison testified during the fitness hearing that Mother was to complete services in the areas of substance abuse, domestic violence, parenting, mental health, housing, and employment.

¶ 82 When the updated case plan was filed on March 28, 2019, and reviewed on June 27, 2019, July 23, 2019, and September 12, 2019, Mother had not engaged in any services. Consistent with the previous orders, Davison testified that Mother had completed "nothing" regarding her services, and had attended less than half of her visits with the children. Given this evidence, at no point during the relevant period was progress being made toward the children's return home goals.

¶ 83 Mother argues that her progress was hindered where Davison exhibited "absolutely no desire to try to return the children home," and that "neither the State nor DCFS had any legitimate desire to ever return—or attempt to return—the children home to the parents." However, based on our careful review of the record, we find this argument meritless.

¶ 84 The record clearly demonstrates that DCFS made reasonable efforts during the relevant nine-month time period. On January 30, 2019, and July 23, 2019, the trial court

entered permanency orders, finding that DCFS had made reasonable efforts in providing services to facilitate the achievement of the permanency goal. Thereafter, on July 16, 2020, the court entered a "REASONABLE EFFORTS ORDER," finding that DCFS had made reasonable efforts through July 16, 2020. Mother did not challenge any of these findings. Furthermore, mother admitted during the fitness hearing that she did not complete any treatment for this case since the case began, and, during the relevant nine-month time period, she had refused to sign consents for referrals and submit to random drug tests. Thus, Mother cannot reasonably argue that there was a concerted effort to prevent her from achieving the return home goal.

¶ 85    Accordingly, we conclude that the trial court's finding that Mother was an unfit person, as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2018)), was not against the manifest weight of the evidence. We now turn our attention to the court's best-interest determinations.

¶ 86    Although the specific issues identified by Mother's counsel in the opening brief relate only to the trial court's finding of unfitness, the notice of appeal specified that Mother was also challenging the court's determination that it was in best interest of the child to terminate parental rights. Additionally, counsel states in the argument section of Mother's brief that it is in the children's "best interest to be with their parents." Illinois Supreme Court Rule 341(h)(3) (eff. Oct. 1, 2020) requires that the appellant's brief contain a statement of the issue or issues presented for review. Despite this obvious deficiency, we note the State chose to address in its reply brief the trial court's best-interest determinations. Given the fundamental right at stake here, we will disregard

28

counsel's failure to comply with the mandatory briefing requirements and review the trial court's best-interest determinations. Counsel, however, is admonished to fully comply with our supreme court's rules in future submissions.

¶ 87    If the trial court finds the parent unfit, the matter proceeds to a second hearing, where the State must prove by a preponderance of the evidence that it is in the child's "best interests" that parental rights be terminated. 705 ILCS 405/2-29(2) (West 2018); *In re D.T.*, 212 Ill. 2d 347, 366 (2004). Following a finding of parental unfitness, the focus shifts entirely to the child. *In re D.T.*, 212 Ill. 2d at 364. Section 1-3 of the Juvenile Court Act lists the "best interests" factors that should be considered by the trial court when making a "best interests" determination. 705 ILCS 405/1-3(4.05) (West 2018). In making a best-interest determination, the trial court must consider the following factors in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to entering and being in substitute care, and (10) the preferences of the persons available to care for the child. *Id*. The court's best-interest determination will be reversed only if it is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005).

¶ 88    Here, the trial court's determinations that it was in the best interest of the children to have Mother's parental rights terminated and to appoint a guardian with the right to consent to their adoption were well-supported by the evidence. We, again, note that when

the children were removed from Mother's care, the living conditions were unsanitary. The children suffered from a lack of basic care and were developmentally delayed. Two of the children had flat heads from extended periods of inactivity.

¶ 89    Additionally, at the time of the best-interests hearing, Bentley B. had been in his current placement for more than 2 years and Gracelynn W. and Jordan W. for more than 2½ years. At the time of the best-interests hearing, the children were no longer developmentally behind, and the children were receiving proper care and comfort. Bentley B. was "doing extremely well" in his foster placement, and his foster parents met all of his specialized needs. Bentley B. had integrated into the foster family and was especially close to his foster brother. Additionally, Gracelynn W. and Jordan W. had developed strong bonds to their foster parents, and the children's foster homes provided a loving and caring environment. Both foster homes were stable, and each set of foster parents desired to adopt. Moreover, there was testimony that the visits with Mother negatively impacted the children.

¶ 90    Under the circumstances, we conclude that the trial court's determinations that it was in the children's best interests to terminate Mother's parental rights were not against the manifest weight of the evidence. We therefore affirm the order of the trial court of Fayette County terminating Mother's parental rights to Bentley B., Gracelynn W., and Jordan W.

¶ 91                                        III. Conclusion

¶ 92    For the preceding reasons, the trial court's determinations that Mother was an unfit parent and that it was the children's best interest and welfare to terminate Mother's

30

parental rights were not against the manifest weight of the evidence. We therefore affirm

the order of the circuit court of Fayette County terminating Mother's parental rights.

¶ 93    Affirmed.