NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (4th) 230542-U

NO. 4-23-0542

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 26, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | No. 19JA22 |
| v. | ) | |
| Casey B., | ) | Honorable |
| Respondent-Appellant). | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

JUSTICE LANNERD delivered the judgment of the court.
Justices Turner and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights.

¶ 2    In April 2022, the State filed an amended petition seeking to terminate the parental rights of respondent, Casey B., to his minor child, L.B. (born in February 2019). L.B.'s mother surrendered her parental rights and is not a party to this appeal. Following fitness and best interest hearings, the trial court granted the State's petition and terminated respondent's parental rights. Respondent appealed and counsel was appointed to represent him. Appellate counsel has now filed a motion for leave to withdraw with a supporting brief pursuant to *Anders v. California*, 386 U.S. 738 (1967), contending "the appeal presents no non-frivolous questions." For the reasons that follow, we grant appellate counsel's motion to withdraw and affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        In May 2019, the State filed a petition for adjudication of wardship, alleging L.B. was a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) in that his environment was injurious to his welfare because (1) his parents had received positive drug test results, (2) respondent had been taken to the hospital after stating he was going to commit suicide, and (3) the mother and L.B. could not be located for more than one week. The petition alleged the Illinois Department of Children and Family Services (DCFS) took L.B. into protective custody on May 23, 2019. The trial court's order for temporary custody stated placement outside the home was in L.B.'s best interest due to lack of cooperation by the parents, concerns about substance abuse by both parents, and domestic violence concerns.

¶ 5        Following the August 20, 2019, adjudicatory hearing, the trial court found L.B. neglected based on the parents' substance abuse, domestic violence in the home, and respondent's mental health issues.

¶ 6        The trial court held the dispositional hearing on September 17, 2019. The dispositional hearing report stated police officers had responded to the parents' home six times for domestic violence complaints since L.B.'s birth, respondent had admitted he used methamphetamines as recently as May 2019, and police officers had taken him to a hospital after he stated he intended to jump off a bridge and commit suicide. The court entered a dispositional order making L.B. a ward of the court and placing his custody and guardianship with DCFS. The court set a permanency goal for L.B. to return home within 12 months. The court emphasized that respondent was required to follow the terms of the service plan, including completing substance abuse and mental health assessments, completing recommended treatment, cooperating with drug

and alcohol screens, cooperating with DCFS, and completing a parenting education class and a domestic violence perpetrator program.

¶ 7        The State filed an initial petition to terminate parental rights on July 12, 2021, and an amended petition on April 8, 2022. In its amended petition, the State alleged, in pertinent part, that respondent was unfit because he failed to (1) make reasonable efforts to correct the conditions which were the basis for L.B.'s removal from respondent's custody during the nine-month periods from August 20, 2019, to May 20, 2020, and from June 1, 2021, to March 1, 2022 (750 ILCS 50/1(D)(m)(i) (West 2020)), and (2) make reasonable progress toward L.B.'s return during those same two nine-month periods (*id.* § 1(D)(m)(ii)).

¶ 8                              A. Fitness Hearing

¶ 9        At the July 12, 2022, fitness hearing, Brooke Matykiewicz, L.B.'s DCFS caseworker since April 2021, testified that during the nine-month period between June 1, 2021, and March 1, 2022, respondent never met with her, never completed a drug screen, and was uncooperative in contacting her. Matykiewicz did not have a valid address or phone number for respondent. To her knowledge, respondent did not cooperate with the recommendations of the substance abuse assessment and did not complete a mental health assessment, a parenting education class, or a domestic violence program. Respondent attended visits with L.B. consistently during the nine-month period, missing only a few of them.

¶ 10        On cross-examination, Matykiewicz acknowledged she could not be sure whether respondent used alcohol or drugs during the relevant nine-month period because she had no contact with him. She also acknowledged she never stopped respondent's visitation with L.B.

¶ 11        Leah Myers testified she was L.B.'s DCFS caseworker during the nine-month period from August 20, 2019, to May 20, 2020. Myers testified respondent completed a substance

abuse assessment during that period, but he was discharged from the recommended treatment because he did not attend consistently. He tested positive for methamphetamine twice between September 2019 and February 2020. He completed a mental health assessment and attended two treatment sessions, but he was also discharged from that treatment because he never returned. Respondent never completed a parenting education course, a domestic violence program, or a psychiatric evaluation. Respondent did attend weekly supervised visitation.

¶ 12         Respondent testified he knew he was required to cooperate with DCFS, complete random drug screens, cooperate with the terms of the service plan, and cooperate with an integrated assessment. According to respondent, he suffered from depression during the month after L.B. was removed and started using methamphetamine and amphetamines. Respondent used these substances for approximately one year. In late summer 2019, he completed a substance abuse assessment at Bridgeway in Galesburg, Illinois. The assessment recommended level one treatment. Respondent attended classes and meetings for one month before being discharged for a failed drug test. Six weeks later, he went back for another intake interview and attended online classes and meetings because it was "when Covid first started." Respondent testified he attended online group meetings for about three months. After three months, however, Bridgeway "stopped accepting [his] log in," and he later received an email stating he was being discharged from the program for not logging in.

¶ 13         Shortly thereafter, in early 2020, he moved to Decatur, Illinois. Respondent testified he informed DCFS of the move and tried to resume treatment in Decatur. He completed an assessment at Heritage Behavioral Health Center (Heritage), but the assessment stated he did not need treatment. Respondent testified he had "been clean for about a year now." The trial court admitted into evidence respondent's exhibit Nos. 1 and 2, identified as two separate assessments

from Heritage. Respondent explained he completed a second assessment to show he was "doing better," and the second assessment included a mental health evaluation. The second assessment also recommended no treatment.

¶ 14　　　　Respondent testified he had attended visitation with L.B. while this case was pending, including after he moved to Decatur. He was unemployed until May 2022, when he began working as a forklift driver at Caterpillar. He was subject to drug testing at work with the last drug test occurring in May 2022.

¶ 15　　　　On cross-examination, respondent acknowledged he did not tell the person performing the assessments at Heritage that he suffered from depression and neither assessment referred to domestic violence issues. Respondent testified he completed a parenting education class "online when Covid was going on." He thought it was completed in 2019. Respondent denied failing to contact his caseworker for periods of time. According to respondent, he contacted her as needed and tried to contact her for about six months with no reply. Respondent acknowledged the first assessment from Heritage stated it was "done for probation" and that he had pled guilty to possession of methamphetamine. Respondent explained the methamphetamine was in a wallet he picked up. Respondent was not aware of any domestic battery charge arising out of that incident involving police officers responding to an argument between respondent and his girlfriend.

¶ 16　　　　In making its findings, the trial court stated respondent "has come up here and provided testimony that just defies reality" and respondent had "very little credibility." The court noted respondent admitted using methamphetamine for a year corresponding with L.B.'s removal and covering the entire first nine-month period. The court found respondent was not truthful in the assessments performed in Decatur and he had failed to verify completion of the requirements ordered at the dispositional hearing. The court stated, "[S]o basically what do we [*sic*] have here

is maybe a completion of a parenting education class *** and you went to visits." Accordingly, the court found respondent (1) failed to make reasonable efforts to correct the conditions which were the basis for the removal of L.B. during each of the two nine-month periods, specifically, between August 20, 2019 and May 20, 2020, and between June 1, 2021 and March 1, 2022, and (2) failed to make reasonable progress toward L.B.'s return during each of those two nine-month periods.

¶ 17                              B. Best Interest Hearing

¶ 18          At the best interests hearing, Matykiewicz testified L.B. was three years old and had been placed with his current foster family for over one year. The foster family had provided day care for L.B. prior to his placement with them and L.B. had been safe and cared for in the home. According to Matykiewicz, L.B. had his own room, his medical needs were being met, and he was doing well in preschool. L.B. also attended church with his foster family. Matykiewicz described the foster family as a "very loving household." L.B.'s biological sister was also placed with the foster family and the foster parents had children of their own. L.B. referred to them as his siblings and his foster parents as "mom and dad." L.B. stated he wanted to stay with his foster family, and the foster parents expressed a desire for him to stay with them permanently. L.B. had been in foster care for over 1254 days.

¶ 19          Matykiewicz testified that L.B. exhibited behavioral issues for a couple days after returning from visits with respondent, including tantrums, not listening, and not knowing how to use the bathroom. She testified L.B. usually returned to his normal behavior within a couple days after returning from visitation.

¶ 20          On cross-examination, Matykiewicz agreed the visits between L.B. and respondent generally went well. However, on one occasion, respondent allowed L.B. to get into a pool during visitation even though L.B. did not have dry clothes to change into. On another occasion,

respondent invited his girlfriend and her children to the visit without prior authorization. Matykiewicz acknowledged respondent had completed a two-hour online parenting course, but she noted it was without prior DCFS approval. The parenting education classes required by DCFS are generally between 8 and 12 weeks long with a one-hour session each week.

¶ 21    L.B.'s foster mother testified she and her husband had taken care of L.B. since he was about four months old. L.B. calls his foster parents "mom and dad." They have four biological daughters ranging from age 9 to age 15, and they are also foster parents for L.B.'s two-year-old half-sister. The foster mother testified L.B. is bonded with all of them as his siblings and she and her husband were interested in adopting L.B.

¶ 22    The foster mother further testified L.B. exhibited behavioral issues after returning from visits with respondent. She allowed respondent to visit with L.B. without DCFS supervision at their church, but the visits stopped after respondent became upset with the foster family and made threatening comments on Facebook.

¶ 23    Respondent testified he currently lived with his girlfriend, her two children, and her granddaughter in a three-bedroom, two-bathroom apartment. A preschool was located one block from the apartment. Respondent had no objection to the foster family continuing to see L.B. Respondent testified L.B. sometimes wanted to stay with him at the end of visits. Respondent testified that on the occasion when L.B. went into the pool in his clothes, respondent got him back out of the pool about an hour before the visit ended so he had time to dry off.

¶ 24    The trial court found it was in L.B.'s best interest to terminate respondent's parental rights. The court recognized respondent had attended visits with L.B. but found the statutory best interest factors weighed heavily in favor of termination.

¶ 25    Respondent filed a timely notice of appeal, and the trial court appointed counsel to represent him. Appellate counsel subsequently filed a motion to withdraw and a supporting brief in compliance with *Anders*. See *In re J.P.*, 2016 IL App (1st) 161518, ¶ 8, 65 N.E.3d 1009 (finding *Anders* applies when counsel seeks to withdraw from representation on direct appeal from orders affecting parental rights under the Juvenile Court Act). Appellate counsel provided proof of service of her motion and supporting brief on respondent and this court granted respondent the opportunity to file a response. Respondent has not filed a response.

¶ 26                                   II. ANALYSIS

¶ 27    Appellate counsel seeks to withdraw, contending there are no non-frivolous issues for appeal. In her memorandum in support of the motion, appellate counsel states she has reviewed whether there are any meritorious arguments challenging (1) the trial court's finding of unfitness or (2) the court's best interests finding. Appellate counsel concluded any such argument would be frivolous. We agree.

¶ 28    The Juvenile Court Act provides a two-step process for involuntary termination of parental rights. 705 ILCS 405/2-29(2) (West 2020). First, the State must prove by clear and convincing evidence the parent is "unfit," as defined by section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E. 2d 508, 516 (2005). Second, if the trial court finds a parent unfit, the State must establish by a preponderance of the evidence that termination of parental rights is in the minor child's best interest. *In re D.T.*, 212 Ill. 2d 347, 352, 818 N.E. 2d 1214, 1220 (2004).

¶ 29                              A. Unfitness Finding

¶ 30    In this case, the trial court found respondent unfit for failing to (1) make reasonable efforts to correct the conditions which were the basis for L.B.'s removal from his custody during

the nine-month periods from August 20, 2019, to May 20, 2020, and from June 1, 2021, to March 1, 2022 (750 ILCS 50/1(D)(m)(i) (West 2020)), and (2) make reasonable progress toward L.B.'s return during those same two nine-month periods (*id.* § 1(D)(m)(ii)). "A parent's rights may be terminated if even a single alleged ground for unfitness is supported by clear and convincing evidence." *Gwynne P.*, 215 Ill. 2d at 349.

¶ 31        Under section 1(D)(m)(ii) of the Adoption Act, a parent may be found unfit for failing "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2020). "Reasonable progress" has been defined as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E. 2d 835, 844 (2007). Reasonable progress exists when the trial court,

> "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E. 2d 1375, 1387 (1991).

We have emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E. 3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461). A court may only consider evidence from the relevant time period in determining a parent's fitness based on reasonable progress. *Reiny S.*, 374 Ill. App. 3d at 1046 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E. 2d 800, 809 (2003)).

¶ 32    The trial court has broad discretion in matters involving minors, and its decisions are given great deference. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E. 2d 422, 427 (2001). A trial court's unfitness determination will not be disturbed on appeal unless it is contrary to the manifest weight of the evidence. *Gwynn P.*, 215 Ill. 2d at 354. A trial court's decision is contrary to the manifest weight of the evidence when the opposite conclusion is clearly apparent. *Id*.

¶ 33    Here, respondent admitted using methamphetamine throughout the entire first nine-month period following L.B.'s removal, from August 20, 2019, to May 20, 2020. DCFS caseworker Leah Myers testified respondent completed substance abuse and mental health assessments during that nine-month period. However, he was discharged from the recommended treatment for both assessments because he either did not attend consistently or quit attending altogether. Myers testified respondent also failed to complete a parenting education course, a domestic violence program, and a psychiatric evaluation. The trial court found respondent's contradictory testimony "just defie[d] reality" and he had "very little credibility." The record shows respondent attended visits with L.B., but he failed to make progress toward completion of any of the requirements for reunification. Respondent's actions cannot be considered "demonstrable movement toward the goal of reunification." See *Reiny S.*, 374 Ill. App. 3d at 1046. Based on the evidence, the court could not conclude respondent would fully comply with the requirements for return of L.B. in the near future. See *L.L.S.*, 218 Ill. App. 3d at 461.

¶ 34    Based on this record, we agree with appellate counsel that no claim of arguable merit can be raised challenging the trial court's finding of unfitness. Because we have concluded the court's finding of failure to make reasonable progress toward L.B.'s return is not contrary to the manifest weight of the evidence, we need not consider the alternative basis for the court's

finding of unfitness. See *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 2, 966 N.E. 2d 1107 (stating a single ground of unfitness under section 1(D) is sufficient to support a finding of unfitness).

¶ 35                                      B. Best Interest Finding

¶ 36        After a parent is found unfit, the parent's interest in maintaining a parent-child relationship must yield to the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E. 2d 1214, 1227 (2004). At the best interests hearing, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *Id.* at 366. In making its finding, the trial court considers the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)). The statutory factors include: (1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including where the child feels love, security, and familiarity; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; and (8) the uniqueness of every family and child. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 37        The trial court's best interest finding will not be reversed on appeal unless it is contrary to the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33, 147 N.E. 3d 953, 959. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result." *Id*.

¶ 38        Appellate counsel contends the statutory factors weigh heavily in favor of termination of respondent's parental rights and no arguably meritorious claim can be made that the trial court's best interest determination is against the manifest weight of the evidence. The evidence

presented at the hearing showed L.B. had been cared for by his foster family since he was four months old and had been placed with them for the past year. L.B. was bonded with his foster parents and the other children in the home. L.B.'s needs for safety, attachment, stability, and permanence were all met by the foster family. His community ties, including school and church, were with the foster family. The evidence showed respondent was unable to care for L.B. As the court stated, "There has been zero demonstrable evidence showing [respondent is] anywhere close to being a placement" for L.B.

¶ 39        We agree with appellate counsel any argument claiming it was not in L.B.'s best interest to terminate respondent's parental rights would be frivolous. At the best interests hearing, the trial court went through the statutory best interest factors individually and found they heavily favored termination of respondent's parental rights. We conclude the court's best interest determination was not against the manifest weight of the evidence.

¶ 40                                III. CONCLUSION

¶ 41        For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 42        Affirmed.