NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250092-U

NOS. 4-25-0092, 4-25-0093 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 20, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.D. and I.D., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | Nos. 23JA104 |
| v. | ) | 23JA105 |
| Rebecca C., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Francis M. Martinez, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Harris and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed the trial court's judgment terminating respondent's parental rights.

¶ 2         In October 2024, the State filed petitions to terminate the parental rights of respondent, Rebecca C., to her minor children, A.D. (born June 2022) and I.D. (born January 2021). Following the fitness and best interest hearings, the trial court granted the State's petition and terminated respondent's parental rights. (The parental rights of the minors' father were also terminated; however, he is not a party to this appeal.) Respondent timely filed a notice of appeal, and counsel was appointed to represent her. Appellate counsel now moves to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), contending there are no meritorious issues of procedure or substance to be raised on appeal which would warrant relief. We agree, grant counsel's motion to withdraw, and affirm the court's judgment.

¶ 3                                    I. BACKGROUND

¶ 4        In March 2023, the State filed separate neglect petitions for the minors pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-2(1)(b) (West 2022)), contending the minors' environment was injurious to their welfare. Relevant to this appeal, the petitions alleged respondent (1) had a history of engaging in acts of domestic violence, which placed the minors at a risk of harm, and (2) had a history of substance abuse preventing her from properly parenting, thereby also placing the minors at a risk of harm. Following a shelter care hearing, the trial court entered a temporary custody order placing the minors in the custody of the Illinois Department of Children and Family Services (DCFS).

¶ 5        In June 2023, the trial court entered an adjudicatory order finding both minors neglected after respondent stipulated to the domestic violence allegations. In August 2023, the court entered a dispositional order making the minors wards of the court after finding respondent unfit or unable for reasons other than financial circumstances to properly care for the minors. Custody and guardianship of the minors was placed with DCFS, and respondent was ordered to cooperate with DCFS's directives.

¶ 6        In October 2024, the State filed petitions to terminate respondent's parental rights, alleging in each petition she was unfit for failing to make reasonable progress toward the return of the minors to her care within any nine-month period following the neglect adjudication (750 ILCS 50/1(D)(m)(ii) (West 2022)). The relevant nine-month periods were June 20, 2023, to March 20, 2024, and November 14, 2023, to August 14, 2024.

¶ 7                                    A. Fitness Hearing

¶ 8        A fitness hearing was held in November 2024. Jaimi Kitchen, a DCFS caseworker, testified she was assigned to this case in May 2023. She stated respondent was required to

cooperate with DCFS, attend supervised visits with the minors, complete a parenting course, and complete an assessment and any recommended treatment for mental health, substance abuse, and domestic violence. Kitchen explained respondent continually denied any mental health issues but would often exhibit threatening, "erratic[,] and volatile" communication with DCFS and other service providers. After respondent's initial mental health assessment, she was not recommended to complete any treatment because, according to Kitchen, respondent denied having any mental health issues. Respondent was referred to a different provider for a subsequent mental health assessment, who recommended counseling. Respondent was also referred for a psychological assessment and subsequent psychiatric services.

¶ 9 Kitchen stated respondent opted to find her own physician for psychiatric services. However, Kitchen later learned the first physician was a primary care provider, not a psychiatrist. Respondent then attempted to receive psychiatric services from a pediatric physician and then a physician licensed out-of-state. Eventually, respondent began receiving psychiatric care from Aunt Martha's Health & Wellness in April 2024. Kitchen concluded respondent had not successfully completed mental health services due to "attendance issues," as she had "never been discharged." Kitchen testified she had not observed any improvement in respondent's mental health. She stated respondent continued to be "very volatile" and "argumentative." She said respondent failed to understand why the minors were removed from her care and, ultimately, blamed DCFS. Kitchen also noted respondent had "yelled, sworn, had to be escorted out of our building and escorted from visits." She stated respondent's counseling reports indicated respondent did not comprehend the extent of her mental health issues or how to properly treat them.

¶ 10 Regarding domestic violence services, Kitchen stated respondent had a history of both perpetrating and being the victim of domestic violence. She noted respondent completed a

partner abuse intervention program in May 2024. However, the agency continued to have concerns because respondent interacted in an "aggressive and threatening manner" with DCFS and service providers. Kitchen referenced two incidents: one from December 2023, wherein respondent was involved in an altercation, and another in July 2024, which involved respondent's parents. The agency sought to address these incidents with counseling, but, according to Kitchen, respondent "missed several sessions."

¶ 11      Regarding substance abuse issues, Kitchen explained I.D. "was born exposed to cocaine." Respondent had missed several drug tests and tested positive for cannabis on completed tests. Kitchen stated respondent completed "maybe 50, 60[%]" of the ordered drug tests.

¶ 12      Regarding parenting services, Kitchen stated respondent's supervised visits with the minors were often terminated early because respondent displayed "unstable emotions" becoming "visibly upset and agitated, frustrated." Respondent was referred to parenting classes but was unsuccessfully discharged in August 2023. As part of the unsuccessful discharge, respondent was recommended for anger management and psychiatric services.

¶ 13      According to Kitchen, respondent missed some visits with the minors and, at some of the visits she attended, respondent discussed the issues of the case, "yelling, screaming, [and] getting upset." This caused the visits to end early. At a visit at the courthouse, respondent abruptly began yelling at a case aid "for looking at her the wrong way." She accused a caseworker of "hurting her son," referencing a "line on his leg from [a] Pull-up [diaper]." However, staff observed no injuries to the child. Kitchen reported respondent had failed to safely secure and supervise one of the minors on a diaper changing table and had failed to properly secure one of the minors in their car seat after a visit. Kitchen also reported staff had to tell respondent it was "inappropriate" to attempt to take a photo of A.D.'s "vaginal area." Finally, Kitchen said, during a visit, A.D. "was

shrinking back and shivering in fear." Respondent told A.D., " 'Stop shivering. It's not cold in here.' " According to Kitchen, "the professionals observed that the child was fearful of [respondent.]"

¶ 14    Kitchen explained the minors' therapist observed respondent's visits and subsequently recommended they be suspended. The agency attempted to modify the visits to permit respondent to interact with the minors in the presence of a parenting coach. However, this was unsuccessful, and the agency suspended respondent's visits in December 2023.

¶ 15    Kitchen stated, after respondent's doctor prescribed an antidepressant in January 2024, she had observed some improvement in respondent's behavior. Kitchen said, "[Respondent] ha[d] not [engaged in] yelling and screaming and [being] visibly red and upset like she used to, but we still [were] seeing a lot of volatile aggressive communication." According to Kitchen, respondent still needed to "work with a psychiatrist and a counselor to be able to demonstrate an understanding of her mental health and demonstrate stabilization of that." Additionally, according to Kitchen, respondent needed to reenroll in parenting classes, continue parent coaching, complete a parent capacity assessment, and successfully complete a substance abuse intensive outpatient program. Kitchen summarized she did not believe respondent could safely parent because respondent had failed to understand why the children were in protective care or the reasons for the various recommended services.

¶ 16    Prior to cross-examination, the trial court admitted without objection respondent's November 2023 psychological evaluation by Dr. Mary Gardner. Gardner had diagnosed respondent with "Schizoaffective Disorders, Bipolar Type." Kitchen did not recall whether she or her staff had requested records from Dr. Gopinath Gorthy, who had diagnosed respondent with an impulse control disorder.

¶ 17 During cross-examination by the guardian *ad litem* (GAL), Kitchen stated respondent had not been honest about her residence or who had been living with her.

¶ 18 On redirect examination, Kitchen confirmed the agency was less concerned about respondent's diagnosis and more concerned about respondent's treatment and outcomes from recommended services.

¶ 19 Dr. Gorthy testified on respondent's behalf. He testified he was a board-certified psychiatrist and had begun working for Aunt Martha's Health & Wellness in December 2023. He began treating respondent in April 2024. Dr. Gorthy stated respondent's medical history did not support a schizoaffective disorder diagnosis. Instead, in his opinion, an impulse control disorder diagnosis was more appropriate. Dr. Gorthy noted respondent had already been taking an antidepressant prior to coming under his care and he did not prescribe any new medications. Dr. Gorthy agreed with Dr. Gardner's previous recommendations for respondent to obtain a parent capacity evaluation, individual psychotherapy, and anger management classes.

¶ 20 April Moore also testified on respondent's behalf. Moore was assigned as respondent's DCFS caseworker in November or December 2023. Moore stated she did not contact Dr. Gorthy. On cross-examination, Moore stated she did not learn about Dr. Gorthy until July 2024 and had not inquired further because respondent indicated she was transferring to a different provider at Rosecrance.

¶ 21 Respondent testified she successfully completed the partner abuse intervention program in May 2024. She admitted she was unsuccessfully discharged from parenting classes. To resume parenting classes, she was required to obtain a psychological assessment, which she obtained from Dr. Gardner in October 2023. She met with her caseworker in December 2023, at which time DCFS suspended her visits with the minors and instructed her to find her own

psychiatric provider. Respondent stated she did not explicitly say she intended to find a new provider at Rosecrance, but she was interested in finding a new provider.

¶ 22        On cross-examination, respondent clarified she only suggested she would see a new psychiatric provider at Rosecrance. She admitted she told Dr. Gorthy she was going to seek treatment at Rosecrance.

¶ 23        Moore testified again for the State's rebuttal evidence. Moore stated respondent's psychological exam by Dr. Gardner was discussed during the same meeting in December 2023 that her visitations with the minors were suspended. Moore stated responded was told repeatedly she needed to obtain follow-up psychiatric care in order for visits to resume. Moore said the agency recommended several psychiatrists, but respondent indicated she "had somebody in mind already."

¶ 24        During cross-examination by the GAL, Moore clarified she did not reach out to Dr. Gorthy because respondent had already expressed a desire to see a new psychiatrist.

¶ 25        The parties presented their closing arguments, and the trial court took the matter under advisement. The parties reconvened in January 2025, wherein the court rendered its decision as to respondent's fitness.

¶ 26        The trial court stated the "main concern throughout this entire case has been [respondent's] mental health." The court noted Kitchen's testimony clearly established respondent began mental health treatment several times but never completed the treatment, stating, "At no point is there evidence that [respondent] completed any mental health program or came closer to reunification." The court noted a significant amount of testimony concerned respondent's interactions with DCFS and providers, but the testimony concerned respondent's efforts, not progress. The court found respondent's efforts were reasonable, but she had failed to make any objective progress toward reunification with the minors. The court stated respondent was "actually

farther away" from reunification than when the case had begun. The court concluded the State had met its burden by clear and convincing evidence.

¶ 27                                    B. Best Interest Hearing

¶ 28        The matter proceeded directly to a best interest hearing. The trial court took judicial notice of the prior proceedings and the best interest report, which stated the minors' physical needs and welfare were being met by their foster parents. The minors had developed a bond with their foster parents, who continued to maintain a relationship with the minors' biological grandmother. The minors received their "comfort, support, love, and *** basic needs" from their foster parents, who had indicated a desire to adopt them.

¶ 29        Respondent testified on her own behalf. She stated, prior to visitations being suspended, the minors had referred to her as their mother. She maintained communication with the minors' therapist after visitation was suspended to remain involved in their lives. After her visits were suspended, she said she had prepared a scrapbook of photographs for them.

¶ 30        When considering the statutory best interest factors (705 ILCS 405/1-3(4.05) (West 2022)), the trial court noted it was clear from the best interest report the minors were "integrated" into their foster home. The court found the minors had "thrived" in their foster placement from the "tremendous support" provided by their foster parents. Because visitation between respondent and the minors had not resumed since December 2023, the court was doubtful reunification was on the horizon. Accordingly, the court found the State had met its burden of proving it was in the best interest of the minors to terminate respondent's parental rights.

¶ 31        Respondent timely filed a notice of appeal, and the trial court appointed counsel to represent her. Appellate counsel filed a motion to withdraw pursuant to *Anders* and a supporting brief providing a statement of facts, a list of potential issues, and arguments as to why those issues

lack arguable merit. See *In re J.P.*, 2016 IL App (1st) 161518, ¶ 8 (finding *Anders* applies when counsel seeks to withdraw from representation on direct appeal from orders affecting parental rights under the Juvenile Court Act). Appellate counsel provided proof of service of her motion and a memorandum on respondent, and this court granted respondent the opportunity to file a response. Respondent failed to respond.

¶ 32                                                    II. ANALYSIS

¶ 33          Appellate counsel seeks to withdraw, contending there are no meritorious claims for review. Counsel indicated she considered whether the trial court's fitness and best interest findings were against the manifest weight of the evidence. Believing they were not, counsel opined any arguments presented to the contrary would be frivolous and patently without merit. After reviewing the record, we agree with counsel and conclude there are no meritorious arguments to be considered on appeal.

¶ 34                                   A. Findings of Parental Unfitness

¶ 35          Parental rights may not be terminated without the parent's consent unless the trial court first determines, by clear and convincing evidence, the parent is unfit under section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). Pursuant to section 1(D)(m)(ii) of the Adoption Act, a parent may be found unfit if she fails "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007). This court has explained reasonable progress exists when a trial court

"can conclude that *** the court, in the *near future*, will be able to

- 9 -

order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *L.L.S.*, 218 Ill. App. 3d at 461). "A trial court's determination that a parent's unfitness has been established by clear and convincing evidence will not be disturbed on review unless it is contrary to the manifest weight of the evidence." *Gwynne P.*, 215 Ill. 2d at 354.

¶ 36        In the case *sub judice*, the trial court correctly noted much of the testimony at the fitness hearing concerned respondent's efforts to find psychiatric care rather than her progress toward *completing* ordered services, which would subsequently lead toward reunifying her with the minors. Despite the parties' conflicting evidence about which doctor's mental health diagnosis was correct, the evidentiary issues did not home in on whether respondent had demonstrated objectively reasonable progress toward reunification. As the court indicated, much of the emphasis regarding respondent's progress centered around mental health treatment. Prior to respondent ever consulting with Drs. Gardner or Gorthy, she had already begun taking an antidepressant medication. Neither doctor changed her prescribed medication. In fact, Dr. Gorthy largely agreed with Dr. Gardner's treatment recommendations. The only difference between the two was what the ultimate psychiatric diagnosis should have been. Thus, the question was whether respondent had progressed with the treatment recommendations of any of her psychiatric providers. The

answer was she had not. The evidence showed respondent continued to struggle with completing recommended services and communicating constructively with DCFS. Furthermore, respondent repeatedly demonstrated an inability to control her emotions and outbursts, leading to her visits with the minors being suspended. When a parent's visits are suspended in the midst of a pending neglect case for the welfare of the children, the very opposite of progress has occurred.

¶ 37 Based on the evidence presented, we agree with appellate counsel any argument the trial court's finding of unfitness was against the manifest weight of the evidence would be meritless. The court's determination respondent was an unfit parent is supported by the record and not against the manifest weight of the evidence.

¶ 38 B. Best Interest Determination

¶ 39 After a trial court finds a parent is unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347, 352 (2004). The trial court's best interest determination will not be reversed unless it is against the manifest weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. "A best-interest determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result." *Id.*

¶ 40 At the best interest hearing, the State must prove by a preponderance of the evidence termination of parental rights is in the child's best interest. See *D.T.*, 212 Ill. 2d at 367. The trial court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act. See 705 ILCS 405/1-3(4.05) (West 2022). However, the court is not required to make a specific reference to each factor in its findings. *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19. These statutory factors include:

"(1) the child's physical safety and welfare; (2) the development of

the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

¶ 41    In this case, the evidence demonstrated the minors' needs were being met by their current foster parents. They had developed a bond and were flourishing. The foster parents indicated a willingness to adopt them. Additionally, the trial court noted any reunification with respondent was further away at the best interest hearing than it had been when the case opened.

¶ 42    As a reviewing court, we afford great deference to a trial court's best interest findings because it sits in a superior position to observe the witnesses, judge credibility, and assess the evidence. *In re C.P.*, 2019 IL App (4th) 190420, ¶ 71. Based on our review of the evidence, we agree with appellate counsel any argument it was not in the minors' best interest to terminate respondent's parental rights would be meritless. The court's best interest findings were based on an appropriate consideration of the statutory factors. Accordingly, we conclude the court's best interest determination was not against the manifest weight of the evidence.

¶ 43                                III. CONCLUSION

¶ 44         For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 45         Affirmed.